## APPEAL OF ELIZA J. JONES ET AL.

[JONES v. WILKEY.]

FROM THE DECREE OF THE COURT OF COMMON PLEAS OF FAYETTE COUNTY, IN EQUITY.

Argued May 14, 1889—Decided May 27, 1889.

(a) A son and daughter of a deceased person filed a bill in equity against their brother, praying that certain conveyances of property executed to the defendant by their father, a short time before his death, be declared void, on the ground of unsoundness of mind on the part of the father and undue influence on the part of the son.

1. The master found in favor of the defendant on all the issues of fact raised by the pleadings, and on exceptions filed by the plaintiffs his report was confirmed: On appeal to this court, the assignments of error raising no question of law and no error being shown in the master's findings of fact, the decree dismissing the bill at the plaintiffs' costs was affirmed.

Before PAXSON, C. J., GREEN, CLARK, WILLIAMS and MC-COLLUM, JJ.

No. 292 January Term 1889, Sup. Ct.; court below, No. 123 Equity D.

Master's Report.

On August 26, 1885, Eliza J. Jones and Henry Wilkey filed a bill in equity against Philip Wilkey, averring in substance that James Wilkey, the father of the parties plaintiff and defendant, died with weakened and impaired mind on November 7, 1883, aged 81 years; that he left surviving him a widow, Catharine, aged 78 years, and four children, to wit: John Wilkey, Henry Wilkey, Eliza J. Jones and Philip Wilkey; that said James Wilkey in his lifetime gave to his son John his full share of his estate; that the defendant Philip Wilkey became his father's agent and confidential adviser, and made use of his position as such to procure, about ten months before his father's death, deeds and transfers of almost the whole of his father's real and personal estate; that these deeds and transfers were made upon a nominal consideration, and conveyed real estate to the value of about $22,000, and personal property to the value of about $8,000, all of which the defendant held and retained in his possession; praying that said deeds and transfers be declared void, etc.

Answer and replication having been filed, the cause was referred to *Mr. Samuel E. Ewing*, as examiner and master, whose report filed on May 5, 1888, showing the facts and questions in controversy, was as follows:

On January 4, 1883, James Wilkey and wife, parents to the parties to this action, executed two deeds to their son, Philip Wilkey, one of which, in consideration of $1,000, conveyed to him about 107 acres of land situate in Dunbar township, Fayette county, Pennsylvania, "to have and to hold during his natural life, for his use, and at his decease, to go to his children equally;" the other deed conveyed to him the undivided one half of a lot in Connellsville, known as the Keeper's property, in fee, for the sum of one dollar. The testimony shows said tract of land to be worth about $100 per acre, making its value $10,700, and said interest in the Keeper's property to be worth about $8,000. During the same month James Wilkey assigned to said Philip Wilkey judgments, mortgages and notes, amounting in value to about $3,850, and thirty-three shares of Youghiogheny Bridge Co. stock, estimated to be worth $70 per share.

James Wilkey had four children, viz.: John, Henry, Eliza

and Philip, all living. This action is brought to have the said deeds and assignments declared void.

James Wilkey, in his lifetime, had given John his proportionate share of his estate, about one fourth thereof. He had also given Henry about $2,000, and to Henry's three sons considerable real and personal estate. He gave Mrs. Jones nine shares of stock of the Youghiogheny Bridge Company in 1881; $200 in 1882, and the Munson note for $1,200 in January, 1883, besides allowing her to live in his property for a number of years without rent.

On January 2, 1883, two days before the date of the above mentioned conveyances, James Wilkey entered into an agreement with Philip, whereby "In consideration of James Wilkey making a deed to Philip Wilkey for his farm in Dunbar township, and deed for a one half undivided interest in the Keeper's house, in Connellsville, as I intend the same to be, that I am to control my farm as though I still held the deed, and the proceeds of said farm I have and reserve for myself, also the rent arising from the Keeper's house, in Connellsville, during my natural life; and should his mother survive me, she to have the homestead house and all in it, and Philip to provide for his mother with all necessary comforts, viz.: money, provisions, and anything she may want for her comfort during her natural life. That in making assignments of certain judgments and promissory notes to Philip, in so doing, it is distinctly understood that Philip is to distribute and pay out the moneys arising from said judgments and notes as I may, from time to time, direct him."

It is not denied that Philip Wilkey lived near his father's house, some seventy-five yards distant, and within call, but at the same time it appears that the complainants lived within two miles of him; that they saw him often, and he visited Mrs. Jones frequently. [It does not appear that Philip was the confidential agent and trusted adviser of his father. There is nothing in the testimony which could lead to this conclusion.] [1] He no doubt assisted in carrying out the wishes of his father relative to his business affairs, but it has not been shown that he was ever advised with concerning them. Mrs. Jones would, at times, collect rents, and account to her father, for them, and Philip did also. It seems that James Wilkey transacted the

Master's Report.

principal part of his business without the aid of his children. During the last year or so of his life, being advanced in years, it was thought best for some one to accompany him to town. Philip, who resided nearer than any of the children, was frequently his companion, as were also James, two grandsons, the son of Philip, and the son of Henry. If James Wilkey had a confidential agent and trusted adviser, the testimony clearly shows that it was J. M. Lytle. Mr. Lytle rented his houses, collected the rents, wrote his business papers, etc. He seems to have had Mr. Wilkey's entire confidence, and was visited and consulted very often by him. [James Wilkey seems to have had a stronger mind, and to have been a better business man, than any of his children, and he was not in the habit of advising with them in regard to his business matters.] [2]

[The allegation that Philip alienated the kind feelings of his father from the complainants and created discord, distrust and hatred in his mind toward them, is not supported by the testimony.] [3] The witness, Mrs. McSwiggen, says she "heard Philip say that Mrs. Jones oughtn't to have anything, because she would marry a smart young man that would run off with it and she would have nothing, and I heard him frequently say to his father that Henry Wilkey's children should have what was coming to him, because he had a wife that would make away with anything she would ever get;" and John Wilkey says, "I understood that Philip had told him Henry spent it," referring to the $2,000 that James Wilkey had given Henry. Out of all the mass of testimony, this is every word which tends to show that Philip endeavored to influence his father in the disposition of his property. Philip, if he did say this, had a right to do so. There was nothing wrong in his trying to save Henry's share for his children, if he thought Henry would not take proper care of it. This was not furthering his own interests; he was not seeking to gain an advantage for himself; indeed [there is nothing to show that Philip had any influence or control over his father.] [4] John testified that for three or four years before his father died, he had been at times requested to come and "settle him," both by his mother and Philip, and that Philip would say he couldn't get along with him, and I was the only one who could do anything with him.

There is no doubt that James Wilkey, being about 80 years

of age at the time these deeds and transfers were made, had failed some in respect to his sight, hearing and memory, especially the former two. The evidence makes this clear. Some of the witnesses go so far as to say that he was incapable of transacting business of importance. This is merely their opinion from seeing him, and not from business intercourse with him. Mrs. Jones says his mind began to fail after his limb was broken, six years before his death, which occurred in November, 1883, but the last two or three years he was much worse, and yet in the last three years she accepted gifts from him amounting in value to over $2,000. John Wilkey says he first noticed this failing of his father's mental ability, when he went to effect a settlement of accounts with him in 1883 or latter part of 1882. This settlement embraced accounts which had been running for many years, and because his father had forgotten payments made to him eleven years before, he says his mind had failed. In this settlement with John Wilkey, did not James Wilkey show his ability to look after his own interests? Is there a single instance given in all the testimony where James Wilkey allowed himself to be imposed upon or cheated in a business transaction?

James Wilkey was a man of strong passions. He ruled his own household, and had grown accustomed to having his own way, and when his will was crossed he became enraged. . . . . In everything he seems to have known and guarded his own interests. He knew when his tenants were behind with their rents; he knew the state of his accounts with the Youghiogheny Bank better than the cashier did. In all the loans he made, he took the precaution to make them secure; [and in every way, so far as the testimony shows, he acted like a sensible, prudent business man.] [5] Richard Campbell, Esq., who had known him for forty years, and who saw him often, and transacted business with him in 1882, says he was as sound as anybody. James Blackstone, who knew him a good many years, and whose farm adjoined Mr. Wilkey's, their residences being about one third of a mile apart, says: "I would have thought that he could have done as sharp a bargain as I could, at any time I ever knew him." Kell Long, John T. Hetzel, Christian Smutz, Wm. Dunn, Conrad Hoop, James Hixon, and numerous other witnesses with whom he had business trans-

Master's Report.

actions, testify that Mr. Wilkey was capable of looking after his own affairs. [The weight of the evidence clearly proves the soundness of James Wilkey's mind, and all the acts attributed to him to prove otherwise, are easily explained by his failing eyesight and hearing,] [6] and unusual irritation, brought about by such special causes as the building of a two story church and the making of a railway cut near his barn.

Because a man of failing eyesight and hearing does not recognize a member of his family, is his mind unsound? Did Mr. Wilkey ever fail to know them, or any other acquaintances, after having been told who they were? And is it not a very easy matter for an old man, in anger, when caught hold of and pressed toward the curbstone, to imagine that an effort is being made to throw him down? How did James Wilkey proceed to make distribution of his estate? Why, on January 2, 1883, he goes alone to the office of his agent, J. M. Lytle, Esq., and has him prepare an article of agreement between him, the said James, and his son, Philip, preliminary to the transfer of the said property to Philip, in which he provides he shall have control of the farm just the same as when the title was in him, and reserving to himself the proceeds of said farm and the rents of the Keeper's property; also making provision for his wife, should she survive him, and the distribution of the moneys arising from the judgments and notes. This article was written just as James Wilkey dictated it, and looks as if he knew full well what the result of his contemplated transfers would be. Following up his intention, as indicated and expressed in this article, on January 4th he directs 'Squire Lytle to prepare deeds to Philip for the real estate, which deeds are on that day, or shortly afterwards, executed and delivered, and on February 6, 1883, are recorded. Then on January 8th, he comes to Uniontown, this time in company with Philip, and makes an assignment of the judgments. [He seems to have known all the time what he was doing, for at the time he gave Mrs. Jones the Munson note, he remarked, "Now I've got nearly all my property out of my hands, and in two or three days I will have it all gone; then John can whistle for his money."] [7]

[Mr. Wilkey lived for ten months after making these deeds and assignments. He knew at this time what he had done.] [8]

Master's Report.

If they had been procured by undue influence; if they were not in accord with his will, he could have taken steps to avoid them, and the complainants would, doubtless, have given him their assistance in the matter. But shortly after they discovered what he had done, they instituted proceedings in lunacy against him. In this, however, they were unsuccessful.

Furthermore, it appears, from the testimony in the case, that the disposition Mr. Wilkey made of his property was substantially in conformity with the will he had executed five or six years previously. The only material difference seems to relate to Mrs. Jones. In the will he had devised her $2,500, but subsequently he gave her in bridge stock, cash and a note, about $2,030, and allowed her to live in the Keeper's house without paying rent. [The testimony shows no undue influence exerted by Philip Wilkey upon his father to accomplish the making of said deeds and assignments. It even shows no solicitation on the part of Philip that such a thing should be done. It seems to have been done by James Wilkey, of his own free will and accord, in the absence and without the knowledge of Philip.] [9] [His mind was not so influenced as to render him incapable of making this disposition of his property. He had a full knowledge of his business affairs, and was still able to look after them,] [10] although his intellect, by reason of his advancing age, may not have been as bright as in his younger days. [That he knew the effect of what he was doing, is evident, from his remark to Mrs. Jones, which we have before quoted.] [11]

The cases of Huguenin v. Baseley, 2 Lead. C. in Eq., Wh. & T., 1156; Nace v. Boyer, 30 Pa. 99, and Trost v. Dingler, 118 Pa. 259, have among others been cited to us by counsel. The first is a very long case, and cites many authorities touching points similar to those raised in this case. The court says on page 1211: "It is nevertheless well settled that when one who, though weak and failing, is not of unsound mind, deliberately bestows his property on a child, in consideration of the latter's undertaking to provide for his support, a court of equity will not avoid the grant, if it appear that he was aware of the consequences of his act and that it could not be recalled." Also on page 1242: "All the authorities agree that weakness of mind not amounting to unsoundness or imbecility, is not a sufficient ground for setting aside a deed or will."

### Master's Report.

With regard to the point raised by complainants as to inadequacy of consideration, we think that such considerations as are set forth in the article of agreement between James Wilkey and Philip have been regarded by our courts as sufficient, especially as between parent and child. Philip Wilkey is still acting under the terms of that agreement. His mother has the homestead house and Philip provides her with whatever she may consider necessary for her comfort. [While neither inadequacy of consideration, nor weakness of mind is alone sufficient to avoid a deed or contract, yet where these two elements exist together, it is almost certain that a court of equity will annul any deed or contract; but even in that case we think the failure of mind would have to be more marked than has been shown with respect to James Wilkey.] [12] The testimony of Mrs. Jones, Henry Wilkey and John Wilkey has been considered, and their competency as witnesses has not been passed upon, for the reason that their exclusion would not alter the conclusion arrived at. [Believing that James Wilkey made the said deeds and assignments of his own free will and accord; that he was capable of making them at the time he did so, and that he knew their full force and effect, we think the bill should be dismissed at the cost of the complainants.] [13]

To the foregoing report the plaintiffs filed twenty-one exceptions, alleging error on the part of the master.

1–13. In the several findings included in [ ] [1 to 13]

14–21. In not finding certain specified facts which were averred in the bill, and in not recommending that the defendant should pay the costs of the proceeding.

These exceptions having been overruled by the master, were filed with his report and renewed before the court. On November 20, 1888, the court, EWING, J., without opinion filed, dismissed said exceptions, confirmed the report of the master, and dismissed the bill at the costs of the plaintiffs, who thereupon took this appeal, assigning as error, specifically:

1–21. The dismissal of plaintiffs' exceptions to the report of the master.[1 to 21]

*Mr. Edward Campbell*, for the appellants.

*Mr. R. H. Lindsey* (with him *Mr. P. S. Newmyer*), for the appellee.

PER CURIAM:

The twenty-one assignments of error in this case are all to the findings of fact by the master. They do not raise any question of law for us to discuss. The learned judge below was satisfied with the master's findings, and it has not been shown here that they are erroneous.

> The decree is affirmed and the appeal dismissed at the costs of the appellants.