[Crim. No. 13410. In Bank. Nov. 7, 1969.]

In re WILLIAM ALBERT TAHL on Habeas Corpus.

124

**COUNSEL**

LeRue Grim, under appointment by the Supreme Court, for Petitioner.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Ronald M. George, Deputy Attorney General, for Respondent.

**OPINION**

**MOSK, J.**—Petitioner pleaded guilty to two counts of murder and one count each of attempted robbery, grand theft, and rape. He was sentenced to death by a jury, and on appeal this court affirmed the judgment in its entirety. (*People* v. *Tahl* (1967) 65 Cal.2d 719 [56 Cal.Rptr. 318, 423 P.2d 246].)

In this habeas corpus proceeding petitioner contends (1) that his guilty plea was not made voluntarily and with full understanding of its consequences; and (2) that the manner of selection of the jury for the penalty phase of his trial was in violation of the standards subsequently established in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. We conclude that petitioner's first contention lacks merit, but his second requires a reversal of his death sentence and a new penalty trial.

I

Petitioner contends that the trial court failed to inform him of the nature and consequences of his guilty plea, and that he at no time expressly waived his right to a jury trial or any other constitutional right. Whether or not petitioner is factually correct, we cannot agree with his legal conclusion that the guilty plea was therefore rendered invalid.

Following initial pleas of "not guilty" on all counts, empanelment of a

jury, and the prosecuting attorney's opening statement to the jury, petitioner asked for and received the trial court's permission to withdraw his pleas and enter pleas of "guilty" in their stead. The trial judge questioned petitioner and his attorney at length regarding these changed pleas; the significant portions of the colloquy among the trial court, petitioner, and his attorney are set forth in the margin.[1] It is apparent that petitioner's

---

[1]Upon petitioner's request, through his attorney, to withdraw his plea of not guilty, the following exchange is revealed by the record: "THE COURT: All right, Mr. Tahl, you come up here with your attorney. Mr. Tahl, your attorney has indicated you want to withdraw your plea of not guilty as to the charges, and we'll take them one at a time. Do you want to withdraw your plea of not guilty as to the first Count?

"THE DEFENDANT: Yes, sir.

"THE COURT: That's the Count charging you with the murder of Vernice Bowen. You do now withdraw your plea of not guilty?

"THE DEFENDANT: Yes, I do.

"THE COURT: Counsel, do you concur in the withdrawal of the plea of not guilty as indicated?

"MR. SMITH [petitioner's attorney]: Yes, your Honor.

"THE COURT: All right, I'll grant you permission to withdraw your plea of not guilty. *You understand the nature of the charges against you in this Count*?

"THE DEFENDANT: Yes, sir, I do.

"THE COURT: *You've discussed this all with Mr. Smith, have you*?

"THE DEFENDANT: Yes, I have.

"THE COURT: *Your attorney has explained your constitutional rights to you,* has he, Mr. Tahl?

"THE DEFENDANT: Yes, sir.

"THE COURT: Are you changing your plea freely and voluntarily, without threat or fear to yourself or to anyone closely related to or associated with you?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: Has anyone made you any promise of a lesser sentence, or probation, reward or immunity, or anything else, in order to induce you to change your plea?

"THE DEFENDANT: No.

"THE COURT: You understand that the matter of sentence is to be determined by the jury or by the Court in this case?

"THE DEFENDANT: Yes, I do.

"THE COURT: This charges you with the murder of Mrs. Bowen. Are you changing your plea to guilty? Is that going to be —

"MR. SMITH: Yes, your Honor.

"THE COURT: Are you changing your plea to guilty because in truth and in fact you are guilty, and for no other reason, Mr. Tahl?

"THE DEFENDANT: Yes, sir.

"THE COURT: Do you waive a further reading of the Indictment as to Count one?

"MR. SMITH: Yes, your Honor.

"THE COURT: What is your plea, Mr. Tahl?

"THE DEFENDANT: Guilty."

The court repeated this process for Counts two (murder) and three (attempted robbery). The question of degree was then taken up (R.T. 274-275):

"THE COURT: All right. The Court will find that the degree of murder as to Count one and Count two is first degree.

"MR. IREDALE [the deputy district attorney]: Your Honor, I think on that matter, if the defense is willing, we'd be willing to stipulate to that.

"THE COURT: I think so. I understood there would be a stipulation that it was first degree, is that right?

"MR. SMITH: So stipulated.

rights were waived more by inference than by express language. Whether such a record is sufficient to indicate a voluntary and understanding plea and an intelligent waiver of rights depends upon the standards which we must apply. As will be seen, these standards, fairly well established at the time of petitioner's conviction, have been altered since that time. It will be necessary to examine first the law as it existed when petitioner pleaded guilty, and then the extent to which that law has been changed by recent Supreme Court pronouncements and the effect, if any, of those changes on petitioner's plea.

Several states and the federal courts have developed over the years an extensive body of law regarding the procedural requirements for acceptance of a guilty plea. (E.g., *McCarthy* v. *United States* (1969) 394 U.S. 459 [22 L.Ed.2d 418, 89 S.Ct. 1166]; *People* v. *Bumpus* (1959) 355 Mich. 374 [94 N.W.2d 854]; *Rudolph* v. *State* (1925) 32 Okla. Crim. 265 [240 P. 761]; *Commonwealth* ex rel. *West* v. *Rundle* (1968) 428

---

"MR. IREDALE: The People so stipulate; does the defendant?

"THE COURT: Mr. Tahl, I think since you've entered your plea, you've got to concur also that this is murder in the first degree.

"THE DEFENDANT: Yes.

"MR. SMITH: Your Honor, is it my understanding that murder in the first degree is stipulated to, since the robbery Count would be first degree robbery, and this is a murder committed in the course of a robbery or attempted robbery?

"THE COURT: Well, I don't know if the District Attorney wants to be limited to that or not.

"MR. IREDALE: My feeling is that *I would assume that the defense attorney has explained to his client, and I would appreciate it if the Court would inquire of the defendant whether he fully understands what we are now talking about, and it has been explained to him,* so that he would stipulate.

"THE COURT: I think so. *This has been explained to you, about murder in the first degree if it's committed while committing a robbery? You understand that, is that right, Mr. Tahl?*

"THE DEFENDANT: Yes.

"THE COURT: With that in mind, do you agree that this is murder in the first degree?

"THE DEFENDANT: Yes, I do.

"THE COURT: In both Counts?

"THE DEFENDANT: Yes, sir."

Had petitioner at this time still entertained any reservations about having pleaded guilty to robbery, which was the legal basis for first degree murder, he was given another opportunity to object to that plea when the court subsequently returned to the robbery count, to establish the degree of the robbery:

"MR. IREDALE: Your Honor, may we go back to Count number three? There's a further matter charged there, and I think in the attempt[ed] robbery that should be established as to degree.

"THE COURT: Yes. Mr. Tahl, I think in the third Count I neglected to ask you if at the time of the commission of the offense—it says 'said defendant was armed with a deadly weapon, to-wit, a .410 gauge shotgun.' Do you admit that you were so armed?

"THE DEFENDANT: Yes, I do." (Italics added.)

Pa. 102 [237 A.2d 196]; Annot. (1964) 97 A.L.R.2d 549.) Either by statute, by case law, or by court rule, these jurisdictions have generally established the principle that before accepting a guilty plea a trial court must be satisfied that the accused understands and freely waives his constitutional rights, especially his rights to counsel and to a jury trial, and further understands the nature of the charge against him and the consequences of his plea of guilty. While courts have stressed the desirability of an affirmative showing on the record as to waiver of rights and understanding of consequences (see, e.g., *Commonwealth* ex rel. *West* v. *Rundle, supra,* at pp. 197-198), no specific language is usually prescribed, the court looking to the overall record and the surrounding circumstances to ascertain the voluntary nature of the plea. (E.g., *People* v. *Doyle* (1960) 20 Ill.2d 163 [169 N.E.2d 250]; *People* v. *Bumpus, supra.*)

California law provides relatively few pronouncements, either legislative or judicial, regarding the acceptance of a guilty plea; but such authorities as exist appear to be in general agreement with the rules in other jurisdictions. Any variance tilts somewhat toward more tolerance and less precision. A review of these authorities convinces us that the guilty plea in the instant case was in conformity with then existing California law.

The most recent definitive statement by this court is found in *People* v. *Mendez* (1945) 27 Cal.2d 20 [161 P.2d 929], in which we stated unequivocally that "There is no statutory requirement in this state that any special admonition be given by the court when accepting a plea of guilty." (*Id.* at p. 22.) As that case demonstrates, there was also no judicially imposed requirement of any admonition. The trial court in *Mendez,* after an abbreviated colloquy with the defendant, determined that the defendant had "advised with counsel," and concluded that the plea was thus free and voluntary. There was neither an inquiry or explanation by the trial court nor an express waiver by the defendant of specific rights; and the court did not enumerate in detail the nature of the charge or the consequences of a guilty plea.[2] Manifestly the examination of the defend-

---

[2]The entire examination of the defendant by the trial court, as set out in the *Mendez* opinion, is as follows (*id.* at p. 21):

"THE COURT: Mr. Mendez, you have considered that matter [of pleading guilty] carefully, have you?

"THE DEFENDANT: Yes, I have, your Honor.

"THE COURT: You have advised with your attorney, Mr. Hill?

"THE DEFENDANT: I did talk it over with him.

"THE COURT: You feel, because you are guilty, that you want to plead guilty, and that you want the court to hear evidence to determine the degree of your guilt; is that correct?

"THE DEFENDANT: That is correct, your Honor.

"THE COURT: You have been fully advised, so the District Attorney may rearraign you."

ant was briefer than that undertaken in the instant case. Yet the *Mendez* court concluded that "The [trial] court's acceptance of the plea after such examination cannot be deemed to have prejudiced the defendant's rights." (*Id.* at p. 22.)

In *People* v. *Emigh* (1959) 174 Cal.App.2d 392 [344 P.2d 851], a similar record appears. The defendant pleaded "not guilty by reason of insanity," a plea which admits commission of the offense itself. Defense counsel stated that the defendant was aware of his rights; the court inquired of defendant if this was correct, and the defendant replied, "Yes." The court then asked the defendant whether he knew the nature of the charge, and upon receiving an affirmative reply accepted the insanity plea. On appeal, the defendant contended he should have been informed of his rights to a speedy trial; a public trial; counsel at all stages of the proceedings; freedom from double jeopardy, self-incrimination, and unlawful search and seizure; a jury trial; and confrontation of his accusers. Only his right to a jury trial had apparently been expressly waived. The Court of Appeal stated, at page 395: "The other rights enumerated by [the defendant] were rights *that would be protected by counsel*. There is no statutory provision which requires that the accused in a criminal case who is represented by counsel be informed as to all his rights. . . . [A]nd where an accused is represented by counsel the court is not under a duty to inform the accused of the effect of such pleas." (Italics added.)

The transcendent importance under California law—as well as that of other jurisdictions—of the presence of counsel at the time of a plea was also emphasized in *People* v. *Loeber* (1958) 158 Cal.App.2d 730 [323 P.2d 136] (hearing denied), in which the defendant claimed the trial court had failed to advise him of the consequences of his guilty plea. The Court of Appeal replied, "The trial court was not required to so 'admonish' [the defendant]. . . . Furthermore, the record also shows that when [the defendant] entered his pleas in the municipal court he was represented by counsel, *who presumably informed him* of the consequences of the plea entered." (Italics added.) (*Id.* at pp. 735-736; see also *Williams* v. *Cox* (10th Cir. 1965) 350 F.2d 847, 849; *United States* v. *Von der Heide* (D.D.C. 1959) 169 F.Supp. 560, 566.)

Thus the crucial factor has generally been the presence of counsel. In a capital case California law does not allow a plea of guilty without counsel; and for lesser offenses counsel must be clearly and expressly waived, a provision our courts scrupulously enforce. (Pen. Code, § 1018; *In re Johnson* (1965) 62 Cal.2d 325 [42 Cal.Rptr. 228, 398 P.2d 420]; *People* v. *Ector* (1965) 231 Cal.App.2d 619 [42 Cal.Rptr. 388].) It is for good reason that the prerequisites for acceptance of a guilty plea are far less precise when counsel is present than when he is not, and the rules regarding

waiver of counsel are more stringent than those regarding waiver of most other rights. If an accused has counsel, courts have generally assumed, in the absence of evidence to the contrary, counsel will perform his duty as an advocate and an officer of the court to inform the accused of and take steps to protect the other rights afforded by the law; whereas if he is without counsel courts have not assumed, again in the absence of a clear showing to the contrary, that the accused will be "sufficiently articulate and adequately conversant with his constitutional and legal rights and his procedural duties to protect himself throughout the course of criminal proceedings." (*People* v. *Mattson* (1959) 51 Cal.2d 777, 789 [336 P.2d 937]; see *People* v. *Evanson* (1968) 265 Cal.App.2d 698, 701 [71 Cal.Rptr. 503] (hearing denied).) Thus the California rule has been stated as follows: "The court must inform the defendant of his right to counsel, but need not inform him of the consequences of his plea; that is the responsibility of his counsel, not the court." (Witkin, Cal. Criminal Procedure (1963) § 253, p. 234.)

In light of these authorities, it is clear that the trial court here adequately examined petitioner prior to accepting his plea of guilty. In fact, rather than simply presuming from the presence of counsel that petitioner had been informed of his rights, the court specifically ascertained from petitioner that he had in fact conferred with counsel as to his rights and the nature of his plea to the charge.[3] We do not mean to imply that the trial court could not have undertaken a more searching examination on the record before accepting the plea; an overabundance of caution is never inappropriate when an accused's rights are in the balance. Indeed, a doubt arises whether a record such as this would be adequate under the recent standards prescribed by the United States Supreme Court, discussed *infra*. We conclude only that, under California law as it existed at the time of petitioner's plea, the examination by the trial court was sufficient and the plea was procedurally valid.[4]

## II

We turn next to ascertain whether the law in effect at the time of petitioner's plea retains its vitality today.

---

[3]Petitioner contends that his answers of "yes" to the queries of the trial court are not sufficient substitutes for more elaborate statements of fact by petitioner himself. He cites no supporting authority in this or any other jurisdiction.

[4]California law has long required that waiver of a jury trial be express. (*People* v. *Holmes* (1960) 54 Cal.2d 442 [5 Cal.Rptr. 871, 353 P.2d 583].) However, prior to *Boykin* v. *Alabama,* discussed *infra*, it was not necessary that acceptance of a guilty plea be preceded by a specific waiver of the right to a jury trial, or any other right (except the right to counsel, where none was present). Therefore, although the present record would be insufficient now to constitute a valid waiver of a jury trial, this does not necessarily preclude holding the plea of guilty to be acceptable under then existing California law.

■ In the recent case of *Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709], the United States Supreme Court held it could not be assumed from a silent record that a guilty plea had been voluntarily made and that the constitutional rights necessarily forfeited by such a plea had been freely and intelligently waived. We conclude, however, that *Boykin* must be applied prospectively only and thus cannot be of aid to Tahl.

In *Boykin* the defendant pleaded guilty to five counts of armed robbery and was sentenced to death, a permissible' penalty for robbery under Alabama law. Although the defendant was represented by court-appointed counsel, the record was "wholly silent" as to any questions by the court or statements by the defendant regarding his plea. The Supreme Court concluded that "[I]t was error . . . for the trial judge to accept petitioner's guilty plea without an affirmative showing that it was intelligent and voluntary." (395 U.S. at p. 242 [23 L.Ed.2d at p. 279].) The court's rationale is expressed in this manner:

"Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. First, is the privilege against compulsory self-incrimination. . . . [Citations.] Second, is the right to trial by jury. [Citation.] Third, is the right to confront one's accusers. [Citation.] We cannot presume a waiver of these three important federal rights from a silent record.

"What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence. When the judge discharges that function, he leaves a record adequate for any review that may be later sought [citations], and forestalls the spin-off of collateral proceedings that seek to probe murky memories." (395 U.S. at pp. 243-244 [23 L.Ed.2d at p. 280].)

The quoted language, while not establishing precise guidelines, makes clear that a plea of guilty cannot stand unless the record in some manner indicates a free and intelligent waiver of the three enumerated rights necessarily abandoned by a guilty plea and an understanding of the nature and consequences of the plea. Clearly the judge's active participation "in canvassing the matter with the accused" is essential, and a fortiori a silent record is insufficient. The troublesome question is the type and quantum of affirmative record required to satisfy the newly prescribed constitutional standard.

There are at least two plausible interpretations of *Boykin*. First, it may be sufficient that there are statements and facts in the record from which a

reasonable presumption could be drawn that a defendant has been apprised of and has voluntarily waived his rights, and has intelligently pleaded guilty. The record in the instant case might well support such a presumption, based largely on the circumstances surrounding petitioner's plea, including but not limited to the presence of and statements by counsel. It is clear from the record, for example, that petitioner knew the nature of the charge and the consequences of his plea: he was present at the *voir dire* examination of prospective jurors, during which the indictment was read in substance and the possibility of the death penalty was announced by the prosecution and made the subject of an extensive inquiry of the jurors. (See *People* v. *Murray* (1967) 247 Cal.App.2d 730, 733 [56 Cal.Rptr. 21]; *People* v. *Doyle* (1960) *supra,* 169 N.E.2d 250, 252.) In addition, petitioner was asked whether he understood "the nature of the charges," to which he answered, "Yes, sir, I do." As to the degree of the crime, the court, at the prosecutor's behest, inquired, "This has been explained to you, about murder in the first degree if it's committed while committing a robbery? You understand that, is that right, Mr. Tahl?" Petitioner replied, "Yes," and agreed that the murder was first degree.

Similarly we can presume petitioner was advised of his rights of confrontation and against self-incrimination from his acknowledgment that his attorney had explained his "constitutional rights" to him. However, there was an apparent deficiency regarding a specific waiver of petitioner's right to a jury trial, since in California such a waiver must be expressed *in words by the defendant* and cannot be implied from the defendant's conduct. (Cal. Const., art. I, § 7; *People* v. *Holmes* (1960) *supra,* 54 Cal.2d 442; *People* v. *Walker* (1959) 170 Cal.App.2d 159 [338 P.2d 536]; cf. *People* v. *McDaniel* (1958) 157 Cal.App.2d 492 [321 P.2d 497]; see fn. 4, *ante.*) Waiver by counsel is not sufficient; a fortiori, having been "advised" by counsel is not sufficient. On the other hand, there can be little dispute under the unusual circumstances of this case that the record demonstrates petitioner actually knew of his right to a jury, since a jury had already been empaneled when he changed his plea. To Tahl, a jury was not an esoteric concept but an existential reality in the guise of 12 identifiable veniremen before whom he stood face to face. But if it is now necessary that an accused specifically waive his right to a jury, California law would seem to require some express courtroom statement by the accused and to preclude waiver by even the most redoubtable inference from the record.

### III

However, we need not resolve this specific issue since it is our view that *Boykin* necessitates a more precise showing on all phases of a guilty plea than mere inferences however plausibly drawn from circumstances on

the record. Thus we reach the second possible interpretation of *Boykin*: that each of the three rights mentioned—self-incrimination, confrontation, and jury trial—must be specifically and expressly enumerated for the benefit of and waived by the accused prior to acceptance of his guilty plea. This, the People concede, was not done in the instant case. While the *Boykin* text contains no such requirement in express terms, we believe it is not only a fair inference from the opinion—especially in light of the court's references therein to the recently strengthened federal guidelines (see *McCarthy* v. *United States* (1969) *supra,* 394 U.S. 459)—but it is the only realistic means of assuring that "the judge . . . leaves a record adequate for any review that may be later sought."[5]

This does not require the recitation of a formula by rote or the spelling out of every detail by the trial court. It does mean that the record must contain *on its face* direct evidence that the accused was aware, or made aware, of his right to confrontation, to a jury trial, and against self-incrimination, as well as the nature of the charge and the consequences of his plea. Each must be enumerated and responses elicited from the person of the defendant. Because mere inference is no longer sufficient, the presence of an attorney cannot alone satisfy these requirements; as noted, the defendant in *Boykin* was represented by counsel.

However, where, as here, the accused has been present at *voir dire* and has heard the indictment read and the consequences in terms of penalty discussed, the court would not necessarily be expected to repeat each of those matters verbatim, a brief examination to ascertain defendant's understanding being sufficient. While much remains within the trial court's discretion, in light of the importance of the rights involved and the consequent exactitude with which constitutional guarantees must necessarily be protected, a trial court would be well advised to err on the side of caution and employ the time necessary to explain adequately and to obtain express waiver of the rights involved. At stake is the protection of both the accused and the People, the latter by the assurance that an otherwise sound conviction will not fall due to an inadequate record.

As we have indicated, an express waiver on the record has long been required in regard to the right to a jury trial; there appears no sound reason why the court should not likewise advise the accused as to, and obtain an express waiver of, his rights to confrontation and against self-incrimination

---

[5]Of course, even if we could interpret the *Boykin* decision more narrowly, we are not precluded from adopting for California a more exacting standard than is minimally required by the federal Constitution, whether to afford greater assurance of the validity of convictions, to protect more fully defendants' rights, or to anticipate future constitutional developments. (See *Johnson* v. *New Jersey* (1966) 384 U.S. 719, 733 [16 L.Ed.2d 882, 892, 86 S.Ct. 1772].)

prior to acceptance of his plea of guilty. We have no doubt that in the course of a trial a waiver of constitutional rights may be implied and need not necessarily be preceded by a full explanation of each right and its consequences. (See *People* v. *Evanson* (1968) *supra,* 265 Cal.App.2d 698, 701-702.) But in proceedings related to a formal plea, at which time the court is required at a minimum to ascertain whether the plea is knowingly made without threat or inducement, it is salutary for the court at the same time to explain the full import of his guilty plea to the accused. Something short of this procedure *may,* in a proper context, be held sufficient; on that we need not rule today.[6] However, in this post-*Boykin* milieu courts and prosecutors are forewarned and will be well advised to avoid any such uncertainty and to produce for the record the required information. Similar advice, given the bench and bar of Pennsylvania in *Commonwealth* ex rel. *West* v. *Rundle* (1968) *supra,* 237 A.2d 196, 197-198, was quoted with approval in the *Boykin* opinion. (395 U.S. at p. 244, fn. 7 [23 L.Ed.2d at p. 280].) It is good advice, and we adopt it.[7]

## IV

As already indicated, we believe that *Boykin* v. *Alabama* and any new procedures dictated by that decision should be given only prospective application. This determination is based on a consideration of the standards for retroactivity recently delineated by the Supreme Court, notably in *Halliday* v. *United States* (1969) 394 U.S. 831 [23 L.Ed.2d 16, 89 S.Ct. 1498]. *Halliday* denied retroactivity to *McCarthy* v. *United States* (1969) *supra,* 394 U.S. 459, in which the requirements of rule 11 of the Federal

---

[6]Thus were the court to ask counsel whether he had advised the defendant of his right of confrontation and ask the defendant whether he waived that right, receiving an affirmative reply to both inquiries, this would satisfy the requirement of an express, on-the-record waiver of that right. (Cf. *People* v. *Evanson* (1968) *supra,* 265 Cal.App.2d 698.) What is required is evidence that the particular right was known to and waived by the defendant. The explanation need not necessarily be by the court, although the waiver must be by the defendant. We reiterate, however, that wherever there is doubt an explicit and direct canvassing of the right with the defendant by the trial court is to be preferred, and may be necessary.

[7]That quotation is as follows: "A majority of criminal convictions are obtained after a plea of guilty. If these convictions are to be insulated from attack, the trial court is best advised to conduct an on the record examination of the defendant which should include, inter alia, an attempt to satisfy itself that the defendant understands the nature of the charges, his right to a jury trial, the acts sufficient to constitute the offenses for which he is charged, and the permissible range of sentences."

This is in effect the type of inquiry long recognized in California as essential if the accused desires to proceed without counsel. (E.g., *In re Johnson* (1965) 62 Cal.2d 325 [42 Cal.Rptr. 228, 398 P.2d 420]; *In re James* (1952) 38 Cal.2d 302 [240 P.2d 596]; *People* v. *Chesser* (1947) 29 Cal.2d 815 [178 P.2d 761, 170 A.L.R. 246].) Our holding today may thus be seen as an extension of the concepts first developed in those cases.

Rules of Criminal Procedure regarding acceptance of a guilty plea were held to be mandatory; a violation of rule 11 necessitates that the guilty plea be set aside.[8]

In concluding that *McCarthy* should apply only to guilty pleas accepted subsequent to that decision, the court relied on its recently developed three criteria for determining retroactivity of constitutional rulings:[9] "(1) the purpose of the new rule; (2) the extent of reliance upon the old rule; and (3) the effect retroactive application would have upon the administration of justice." (394 U.S. at p. 832 [23 L.Ed.2d at p. 19].) The court then explained the purposes of *McCarthy*: to assure application of the procedural safeguards of the rule and to provide a "complete record" for a "more expeditious disposition of a post-conviction attack on the plea." Similar purposes are expressed in *Boykin,* the gist of the constitutional defect there being a silent record, inutile on appeal.

After pointing out that a defendant could attack an involuntary plea even in the absence of compliance with rule 11 by the trial court—as can a state defendant whose plea was accepted prior to *Boykin* (cf. *Johnson* v. *New Jersey* (1966) *supra,* 384 U.S. 719, 730 [16 L.Ed.2d 882, 890, 86 S.Ct. 1772])—the *Halliday* court explained what it obviously considered the most significant factors under the circumstances—reliance on the old rule and the effect on the administration of justice—as follows: "In *McCarthy* we noted that the practice we were requiring had been previously followed by only one Circuit; that over 85% of all convictions in the federal courts are obtained pursuant to guilty pleas; and that prior to Rule 11's recent amendment, not all district judges personally questioned defendants before accepting their guilty pleas. Thus, in view of the general application of Rule 11 in a manner inconsistent with our holding in *McCarthy,* and in view of the large number of constitutionally valid convictions that may have been obtained without full compliance with Rule 11, we decline to apply *McCarthy* retroactively." (394 U.S. at p. 833 [23 L.Ed.2d at p. 20].)

---

[8]Rule 11 provides, in pertinent part, that a court "shall not accept [a guilty plea] without first addressing the defendant personally and determining that the plea is made voluntarily with understanding of the nature of the charge and the consequences of the plea. . . . The court shall not enter a judgment upon a plea of guilty unless it is satisfied that there is a factual basis for the plea."

In *McCarthy* there was a failure to address the defendant personally to determine whether he understood the nature of the charge against him.

[9]Although *McCarthy* was based solely on rule 11 and not on constitutional considerations, the court in *Halliday* found it "appropriate to analyze the question of that decision's retroactivity in terms of the same criteria we have employed to determine whether constitutionally grounded decisions that depart from precedent should be applied retroactively." (394 U.S. at p. 832 [23 L.Ed.2d│at│p. 19].) Thus the *Halliday* determination is properly applicable to the constitutionally grounded decision in *Boykin.*

As indicated above, the prior practice in this and many other jurisdictions, upon which trial courts and prosecutors justifiably relied for decades, included the substance but not the form of the *Boykin* requirements as we have interpreted them. In addition, while we endorse the Supreme Court's determination that more explicit proceedings are both necessary and desirable to assure the utmost constitutional protection to an accused, we also must recognize that a "large number of constitutionally valid convictions . . . may have been obtained"—and indeed were obtained—under the previous practice.[10] To invalidate all such prior guilty pleas years and decades after their acceptance would have a dolorous effect upon the administration of justice. (See *Johnson* v. *New Jersey* (1966) *supra,* 384 U.S. 719, 731 [16 L.Ed.2d 882, 891, 86 S.Ct. 1772].)[11] In light of these combined legal and pragmatic factors, we believe *Boykin* v. *Alabama* and the procedures adopted herein must be given prospective application only , i.e., to those cases in which pleas were entered subsequent to the effective date of that decision. ▮▮ As petitioner pleaded guilty well prior to that date, and we have determined his plea to be voluntary and in conformity with then prevailing California law and practice, petitioner's procedural attack on his plea must fail. As petitioner makes no other substantial allegation that his plea was involuntary, his conviction must be upheld.[12]

---

[10]The magnitude of the potential effect on the administration of justice is apparent when we note that in California for the years 1960 through 1967 felony convictions obtained on pleas of guilty totaled 173,496. (Crime and Delinquency in California (1967) p. 100.) The number of misdemeanor convictions would be considerably higher.

[11]A plea of guilty is in essence a confession in open court, and the procedures necessitated by the *Boykin* decision are analogous to those set out for in-custody interrogation in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974.] In *Johnson* v. *New Jersey, supra,* the Supreme Court declined to apply *Miranda* retroactively, recognizing that confessions lacking *Miranda* warnings were not necessarily involuntary and that those warnings simply added "important new safeguards" against coerced confessions. Similarly, the absence of *Boykin* warnings does not necessarily negate the voluntary nature of a guilty plea, and the "important new safeguards" herein established may fairly be applied prospectively only.

[12]Petitioner now alleges that at the time he pleaded guilty he was under the influence of "six dosages of phenobarbital," allegedly obtained partly from a cellmate and partly from prison authorities. This is petitioner's first mention of the ingestion of a drug, or indeed of any condition rendering his plea of guilty or his conduct at any other stage of his trial involuntary, although petitioner filed an extensive brief on direct appeal from his conviction. Petitioner offers no explanation of his failure to raise this issue on his automatic appeal. (See *In re Shipp* (1965) 62 Cal.2d 547 [43 Cal.Rptr. 3, 399 P.2d 571]; *In re Swain* (1949) 34 Cal.2d 300 [209 P.2d 793].) Moreover, petitioner relates no details as to how, when, or why the drugs were taken, and offers no information as to the probable or necessary effect of "six dosages" of phenobarbital. The only evidence of any relevance on this point is contained in the People's brief, which points out that petitioner was apparently receiving three ¼ grain doses of phenobarbital per day while in jail three weeks *following* his guilty plea. We take judicial notice under Evidence Code section 452, subdivision (h), that six

## V

 Finally, we consider petitioner's contention that the jury selection violated the standards established in *Witherspoon* v. *Illinois* (1968) *supra,* 391 U.S. 510. We agree, and remand the case for a new trial on the issue of penalty.

In *Witherspoon* the United States Supreme Court, recognizing that a jury which excludes all those persons with some bias against the death penalty "cannot perform the task [of determination of penalty] demanded of it," announced the retroactive rule that a death penalty imposed by such a death-oriented jury cannot stand. "A man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror." (391 U.S. at p. 519 [20 L.Ed.2d at p. 783].) Before he can be excluded a juror must make "unmistakably clear (1) that [he] would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [him], or (2) that [his] attitude toward the death penalty would prevent [him] from making an impartial decision as to the defendant's *guilt.*" (Italics in original.) (*Id.,* at pp. 522-523, fn. 21 [20 L.Ed.2d at p. 785].)

The first juror improperly excluded in the instant case was Mrs. Sonneborn. She initially told the court she was "against capital punishment." The court then stated generally to the veniremen: "I think I should ask any of you at this time if you feel so strongly against the death penalty that you can't impose the death penalty under any circumstances, I wish you'd tell me now." Had the court stopped at this point, Mrs. Sonneborn's reply, "I would not, no" might have been sufficient to exclude her. However, before that reply the court added to its general statement the following specific question: "We'll take Mrs. Sonneborn—you are against capital punishment and *would not want to sit on such a case,* I take it?" (Italics added.) The juror then replied, as indicated, "I would not, no." She was then excused for cause.

The People urge us to look to the entire *voir dire* record, putting Mrs. Sonneborn's answer into "full context," and thus to consider it as in reality a reply to the court's general question whether any juror could not "under any circumstances" impose the death penalty. (See *People* v. *Varnum*

---

¼-grain doses of phenobarbital would be the normal "hypnotic" (sleep-inducing) dose (see Osol, Pratt & Altschule, The United States Dispensatory and Physicians' Pharmacology (26th ed. 1967) pp. 886-887; Goodman & Gilman, The Pharmacological Basis of Therapeutics (3d ed. 1965) p. 122); we consider it most unlikely that a man who had taken no more than the normal sleep-inducing amount of a common sleeping medicine would be disabled from understanding the consequences of a plea of guilty to murder. Nothing in the record shows that petitioner was less than fully conscious and alert at the time of his plea. Petitioner's allegation is patently improbable and affords no basis for an evidentiary hearing.

(1969) 70 Cal.2d 480, 493 [75 Cal.Rptr. 161, 450 P.2d 553].) As we said in *Varnum,* however, "To ascertain what the juror meant by what he said, we must consider not merely the words of his answers but also the words of *the question he was asked* and additionally all of the circumstances in which the colloquy took place." (Italics added.) (*Id.* at p. 493.)

Applying the above test, looking to the only specific question asked of Mrs. Sonneborn and the answer she gave to that question, which answer resulted in her exclusion, the court clearly excused Mrs. Sonneborn after having ascertained only that she "would not [*want to sit on such a case*], no." ■ We need not belabor an obvious point: a prospective juror's personal wants or desires, so long as they do not preclude an impartial determination of guilt or render automatic a vote against the death penalty, are wholly irrelevant and provide no basis for exclusion under the *Witherspoon* standard.

■ After Mrs. Sonneborn was excused, the court proceeded to elicit from each juror in turn an answer to the following question: "Do you have any feeling against the imposition of the death penalty that would make you feel you couldn't sit as a fair and impartial juror *if that matter was placed to you?*" "MRS. DELANEY: I do have. THE COURT: You feel that *if it came to the second phase of this case,* if that does transpire, that you couldn't sit as a fair and impartial juror, is that right? MRS. DELANEY: Yes. THE COURT: All right, I'll excuse you for cause then." (Italics added.)

The above exchange indicates only that Mrs. Delaney entertained a bias against the death penalty which would preclude her sitting as a "fair and impartial" juror at the penalty (second) phase of the trial. ■ As set out earlier, the *Witherspoon* court made it abundantly clear that partial jurors could only be excused where their bias would result in an *automatic* vote against the death penalty or would preclude impartiality on the question of *guilt.* (391 U.S. at pp. 522-523, fn. 21 [20 L.Ed.2d at p. 785].) ■ Mrs. Delaney stated only that she could not be impartial on the question of *penalty*—a circumstance she necessarily shared with all persons predisposed against the death penalty. Again, the only question asked Mrs. Delaney, like that asked Mrs. Sonneborn, in no way related back to the court's original general statement about imposition "under any circumstances." The exclusion of both Mrs. Sonneborn and Mrs. Delaney was reversible error under *Witherspoon.*

The writ is granted as to the penalty trial. The remittitur issued in *Peo-*

*ple* v. *Tahl,* Crim. 9960, is recalled, and the judgment imposing the death penalty is reversed insofar as it relates to the penalty. In all other respects the judgment is affirmed.

Traynor, C. J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.,** Dissenting.—I would deny the writ of habeas corpus.

**PETERS, J.,** Concurring and Dissenting.—I concur with the majority's conclusion that the exclusion of jurors Sonneborn and Delaney constituted reversible error as to the penalty verdict, and with the majority's reading of *Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709] as requiring a trial judge expressly to explain, and a defendant expressly to waive, constitutional rights to a jury trial, to confrontation, and against self-incrimination before a guilty plea is accepted. I also concur with the majority's refusal to apply to decisions final prior to *Boykin* that case's requirement that express explanations and waivers appear on the record.

I believe, however, that the realities of criminal justice demand a more basic reform of plea procedures than that undertaken by the majority if we are to serve the laudable objectives of *Boykin.* A trial judge cannot meaningfully assess the voluntariness of a guilty plea, and the record of plea proceedings cannot fairly preclude a claim of the plea's invalidity, as long as defendants are expected to hide the most common motivation for such pleas: plea bargains. I would require that all plea bargains be set forth on the record and that defendants be fully advised of the possible consequences of the bargain they have entered.

We have recognized that a substantial portion — probably the vast majority—of criminal cases are disposed of through the process of plea bargaining. (*In re Hawley,* 67 Cal.2d 824, 828 [63 Cal.Rptr. 831, 433 P.2d 919].) We also know that most bargains do not appear on the record, and that defendants whose pleas have been obtained by promises of leniency are usually expected to deny the existence of such promises in spite of the common knowledge of judge, prosecutor, and defense counsel to the contrary. (See, e.g., American Bar Assn. Advisory Committee on the Criminal Trial, Standards Relating to Pleas of Guilty (tentative draft 1967) p. 61.) The result, in such cases, is that the entry of the plea is a ritual in which the recitations of the participants have little relation to reality. A defendant who is expected to lie when the judge asks if a guilty plea is the result of a promise of leniency is in no position to engage in a forthright exchange with the same judge at the same time when the question is the defendant's understanding and relinquishment of his constitutional rights. Only if the defendant can be expected to be truthful will the *Boykin*

procedure protect against unknowing or involuntary waivers. If the defendant is expected merely to recite a script, a full record will be of absolutely no use in distinguishing the meritorious from the frivolous collateral attacks on guilty pleas.

An important part of a trial judge's task is to ensure that a guilty plea is not the product of " 'duress, fraud, or other fact overreaching the free will and judgment of a defendant' " (*People* v. *Wadkins,* 63 Cal.2d 110, 114 [45 Cal.Rptr. 173, 403 P.2d 429]), and to forestall frivolous attacks on such pleas. Accordingly, I believe that whenever such information is relevant to the terms of a disclosed bargain, a defendant should be told of the broad discretion of the Adult Authority (Pen. Code, §§ 1168, 3020, 5077), that the authority is apprised of the prosecutor's and judge's views of the defendant and his crime (Pen. Code, § 1203.01), and that in determining the defendant's sentence and parole eligibility, the authority may consider charges that the prosecutor has agreed to drop in return for the guilty plea.

When the trial judge is fully aware of the terms of a plea bargain, and satisfied that the plea is otherwise valid, he should give the defendant an opportunity to withdraw the plea if the judge will not accept those terms. (*People* v. *Delles,* 69 Cal.2d 906 [73 Cal.Rptr. 389, 447 P.2d 629].)

In two respects, I disagree with the majority. I would hold (1) that *Boykin's* formal requirement of record proof of explanations and waivers applies to all cases not yet final, and (2) that *Boykin's* substantive requirement that valid waivers *in fact* accompany a plea—regardless of the state of the record—is entitled to full retroactive effect.

As to the first point, I believe that *Boykin's* formal requirement should apply to cases not yet final in accord with "[t]he historic pattern of applying the court's current expression of a basic principle to cases pending on appeal. . . ." (*People* v. *Charles,* 66 Cal.2d 330, 334 [57 Cal.Rptr. 745, 425 P.2d 545].) Especially where only decisions based on guilty pleas are involved, and the time between plea and finality relatively short, I do not believe that the burden on the administration of justice or the dimming memories of potential witnesses justifies any departure from the "historic pattern." (See also my dissents in *People* v. *Edwards,* 71 Cal.2d 1096, 1110 [80 Cal.Rptr. 633, 458 P.2d 713]; *People* v. *Feggans,* 67 Cal.2d 444, 449 [62 Cal.Rptr. 419, 432 P.2d 21]; *People* v. *Rivers,* 66 Cal.2d 1000, 1005 [59 Cal.Rptr. 851, 429 P.2d 171]; *People* v. *Rollins,* 65 Cal.2d 681, 693 [56 Cal.Rptr. 293, 423 P.2d 221].)

My second disagreement with the majority relates to the substantive law

enunciated by *Boykin.* Faced with a record which revealed nothing more than the fact of the petitioner's guilty plea, *Boykin* noted that such a plea is "more than a confession" and involves a waiver of rights to a jury trial, to confrontation, and against self-incrimination. (395 U.S. at pp. 242-243 [23 L.Ed.2d at pp. 279-280].) *Boykin* reasoned that since the admission of a confession must be based on a " 'reliable determination on the voluntariness issue,' " and since a waiver of the right to counsel is invalid unless the record, or allegation and evidence, shows an intelligent and understanding rejection of counsel by the accused, "[w]e think that the same standard must be applied to determining whether a guilty plea is voluntarily made." (*Id.,* at p. 242 [23 L.Ed.2d at p. 279].) Because prior case law precluded presuming a waiver of counsel from a silent record, and in order to facilitate direct and collateral review, *Boykin* concluded that "[w]e cannot presume a waiver of these three important federal rights from a silent record." (*Id.,* at pp. 242-244 [23 L.Ed.2d at pp. 279-280].) I agree with the majority that *Boykin's* concern with the state of the record means that in the future we must presume the *absence* of constitutional waivers from the existence of a silent record. This is the formal and prophylactic aspect of *Boykin.* But *Boykin* also stands for the proposition that a guilty plea includes constitutional waivers and is therefore invalid unless in fact entered by a defendant who understands the implications of the plea and has decided voluntarily to forego his rights.

Although the majority does not address itself to this substantive aspect of *Boykin,* its affirmance of petitioner's guilt verdict in the face of his allegations implies a denial of retroactivity not only to *Boykin's* formal demands, but also to the substantive rights which those demands were designed to protect.

In so doing, the majority has departed from the practice of both this court and the United States Supreme Court. Thus, although both courts have denied retroactivity to decisions excluding confessions obtained in the absence of counsel, both courts have recognized that collateral relief is available for those who can show that their confessions were in fact involuntary. (*Johnson* v. *New Jersey* (1966) 384 U.S. 719, 730 [16 L.Ed.2d 882, 86 S.Ct. 1772]; *People* v. *Rollins, supra,* 65 Cal.2d at p. 686; *In re Lopez,* 62 Cal.2d 368, 375-377 [42 Cal.Rptr. 188, 398 P.2d 380].) Similarly, although both courts have denied retroactivity to decisions demanding the presence of counsel at lineups to ensure fairness, both courts have recognized that collateral relief is available for those who can show that their lineups were in fact violative of due process. (*Stovall* v. *Denno* (1967) 388 U.S. 293, 299 [18 L.Ed.2d 1199, 1204, 87 S.Ct. 1967]; *People* v. *Feggans, supra,* 67 Cal.2d at pp. 448-449.)

Even the federal decisions upon which the majority relies are in full

accord with retroactive application of the substantive rights protected by the prospective procedure with which they deal. In denying retroactive effect to *Boykin,* the majority analogizes the *Boykin* case to *McCarthy* v. *United States* (1969) 394 U.S. 459 [22 L.Ed.2d 418, 89 S.Ct. 1166], and today's case to *Halliday* v. *United States* (1969) 394 U.S. 831 [23 L.Ed.2d 16, 89 S.Ct. 1498]. *McCarthy* interpreted rule 11 of the Federal Rules of Criminal Procedure to require that a district judge personally address a defendant to determine that he understands the nature of the charges against him and the consequences of a guilty plea, and to demand that a district judge refuse to accept such a plea until he is satisfied that it has a basis in fact. The *McCarthy* court held that any defendant whose plea was accepted without full compliance with rule 11 could plead anew. Although *Halliday* denied retroactive effect to *McCarthy's* rule that a formal violation of rule 11 per se entitles a defendant to withdraw his guilty plea, the court was careful to point out that "a defendant whose plea has been accepted without full compliance with Rule 11 may still resort to appropriate post-conviction remedies to attack his plea's voluntariness. Thus, if his plea was accepted prior to our decision in *McCarthy,* he is not without a remedy to correct constitutional defects in his conviction. Cf. *Johnson* v. *New Jersey, supra,* at 730 [16 L.Ed.2d at 890]." (394 U.S. at p. 833 [23 L.Ed.2d at p. 20].) The *Halliday* court noted that the petitioner before it had already been afforded a hearing on the voluntariness of his plea, at which "the Government had met its burden of demonstrating that petitioner entered his plea voluntarily with an understanding of the nature of the charges aganist him." (*Id.,* at pp. 831-832 [23 L.Ed.2d at p. 19].)

Accordingly, the logic of *Johnson* v. *New Jersey, supra, Stovall* v. *Denno, supra,* and *Halliday* v. *United States, supra,* means that today's decision should deny retroactive effect only to the formal requirements of *Boykin,* and that we should give full retroactive effect to the substantive rights which the formalities were designed to protect. Any prisoner convicted on a guilty plea should be entitled to collateral relief if he can show that the plea was not voluntary in the constitutional sense because unaccompanied by understanding and voluntary waivers of constitutional rights to confrontation, to a jury trial, and against self-incrimination.

We should accord the substantive rights *Boykin* enunciated full retroactive effect because any violation of those rights fundamentally and completely "infects the integrity of the truth-determining process at trial. . . ." (*Stovall* v. *Denno, supra,* at p. 298 [18 L.Ed.2d at p. 1204].) Unlike a violation of *Boykin's* formal requirements, any departure from *Boykin's* substantive rule necessarily means that a defendant has pleaded guilty without voluntarily and intelligently waiving his rights to a jury trial,

to confrontation, and against self-incrimination. In turn, any violation of *Boykin's* substantive demand means that an invalid plea has precluded *any* truth-determining process; thus considerations of reliance and the burden on the administration of justice are improper. (Cf. *Desist* v. *United States* (1969) 394 U.S. 244, 251-252 [22 L.Ed.2d 248, 256-257, 89 S.Ct. 1030, 1048].)

The majority indicates that a prisoner who pleaded guilty prior to *Boykin* will be forced to rely on pre-*Boykin* California law to attack that plea—law which did not require that a trial judge give a defendant any admonition prior to accepting his guilty plea if that defendant were represented by counsel (*People* v. *Mendez,* 27 Cal.2d 20, 22 [161 P.2d 929]; *People* v. *Loeber,* 158 Cal.App.2d 730, 735-736 [323 P.2d 136]), and which held that "no error in the [plea] procedure could have prejudiced [an] appellant because of a failure of the court to enumerate" constitutional rights. (*People* v. *Emigh,* 174 Cal.App.2d 392, 394-395 [344 P.2d 851].) In short, California law conclusively presumed waiver from a silent plea record whenever the defendant was represented by counsel. (Cf. Witkin, Cal.Criminal Procedure (1963) § 253, p. 234.)

Although the petition before us is primarily concerned with the inadequacy of the record of the plea proceedings, the petitioner expressly alleges that at the time of his plea he did not comprehend the nature of the charges against him, that he was ignorant of the felony-murder doctrine, and had no appreciation of the fact that his plea made him eligible for capital punishment—in part because he was under the influence of "six doses" of phenobarbital. In response, the majority cites *In re Cameron,* 68 Cal.2d 487, 501, fn. 8 [67 Cal.Rptr. 529, 439 P.2d 633], for the proposition that "[w]ith a hypnotic drug . . . the fact that the individual is conscious indicates that he is no longer under the influence of the drug." That quote paraphrases medical testimony in a totally unconnected case which is in no way binding on the present petitioner. Especially when the People admit that petitioner had been receiving three ¼ grain doses of phenobarbital a day, and when medical authorities indicate that barbituates affect different subjects in different ways and may result in the subject becoming mentally confused (see Brown, The Enigma of Drug Addiction (1961) p. 27; 1 Lundquist, Methods of Forensic Science (1962) p. 377), I do not think we should dismiss the allegation summarily.

The majority also alludes to the petitioner's affirmative responses to questions as to whether he had been advised of his rights, the nature of the charges against him, and the consequences of his plea. But these responses beg the questions in issue: only if petitioner in fact understood the felony-murder doctrine, the nature of the charges against him, the fact that his plea

made him eligible for capital punishment, and the extent of his constitutional rights could he have been competent to answer.

In my view the petitioner has sufficiently alleged that his plea was involuntary and that he did not knowingly waive his rights. I believe he should be afforded a hearing to determine the truth of his allegations.

Petitioner's application for a rehearing was denied December 10, 1969, and the opinion was modified to read as printed above. Peters, J., was of the opinion that the petition should be granted.