Filed 11/6/13  P. v. Albarran CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F065855 |
| Plaintiff and Respondent, | (Super. Ct. No. BF137702E) |
| v. | |
| CRISTIAN ALBARRAN, | **OPINION** |
| Defendant and Appellant. | |

---

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Gary T. Friedman,  Judge.

Donn Ginoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*]      Before Kane, Acting P.J., Franson, J., and Peña, J.

## INTRODUCTION

On August 9, 2011, appellant, Cristian Albarran, and four codefendants were charged in a second amended indictment with first degree murder (Pen. Code, § 187, subd. (a), count one),[1] second degree robbery (§ 212.5, subd. (c), count two), shooting at an occupied vehicle (§ 246, count three), and participation in a criminal street gang (§ 186.22, subd. (a), count four).[2] The second amended indictment included special allegations as to count one that appellant committed his offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), acted as a principal in the commission of murder and at least one other principal intentionally and personally discharged a firearm proximately causing great bodily injury or death of the victim (§ 12022.53, subds. (d) & (e)(1)), was a principal in the commission of murder and committed the special circumstance of being an active participant in a criminal street gang (§ 190.2, subd. (a)(22)), and participated in the special circumstance of robbery while committing murder (§ 190.2, subd. (a)(17)(A)). Counts two and three included the same special gun and gang allegations as were alleged in count one, but not the special circumstance allegations.

A jury trial began for appellant and all of the codefendants on May 16, 2012. On the second day of trial, appellant entered into a plea agreement whereby he would admit count two, second degree robbery, the gang enhancement and a gun enhancement pursuant to section 12022.53, subdivisions (c) and (e)(1). Under the terms of the plea agreement, appellant would receive a stipulated sentence of 5 years on count two and a

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

[2] The indictment further alleged that although appellant was a minor when he committed the offenses, he was 16 years of age or older when he committed offenses listed in Welfare and Institutions Code section 707, subdivision (b) and within the meaning of Welfare and Institutions Code section 707, subdivision (d)(1). Four additional counts were alleged as to other codefendants but not as to appellant.

consecutive term of 20 years for the gun enhancement for a total prison term of 25 years. Appellant executed a felony advisement of rights, waiver and plea form acknowledging the terms of the plea agreement, the consequences of his plea, his constitutional rights pursuant to *Boykin*/*Tahl*,[3] and waiving his constitutional rights.

The trial court advised appellant of the consequences of his plea and his constitutional rights pursuant to *Boykin*/*Tahl*. The parties stipulated to a factual basis for the plea based on the police reports and the transcript of the grand jury hearing. Appellant pled no contest to a felony violation of count two. Appellant admitted two enhancements and the allegation that he was 16 years old or older when he committed the offense and the offense was listed in Welfare and Institutions Code section 707, subdivision (b), within the meaning of Welfare and Institutions Code section 707, subdivision (d)(1).

On June 15, 2012, the court granted appellant's request for a substitution of trial counsel to investigate whether appellant had grounds to withdraw his plea. Appellant alleged that he entered his plea through mistake, ignorance, and inadvertence because he lacked maturity and sufficient time to deliberate the plea bargain, he was confused over the length of the sentence, and the character of the victim potentially supported a meritorious defense.

Defense counsel was examined during the hearing. Defense counsel explained he reviewed potential defenses with appellant, but also pointed out to appellant that he had little evidence from which to mount a defense. Defense counsel explained to appellant the legal concepts of aiding and abetting as well as conspiracy. Defense counsel was concerned that appellant was very young and faced a potential sentence of life without

---

[3]     *Boykin v. Alabama* (1969) 395 U.S. 238 and *In re Tahl* (1969) 1 Cal.3d 122 (*Boykin/Tahl*).

the possibility of parole. Defense counsel recommended to appellant that he accept the plea agreement but explained it was completely up to appellant whether or not to accept the plea bargain. At the conclusion of a hearing on September 14, 2012, the trial court denied appellant's motion to withdraw his plea and proceeded to sentence him.

The court sentenced appellant to the stipulated sentence of 25 years, comprising 5 years for second degree robbery and a consecutive term of 20 years for the gun use enhancement. The court stayed the gang enhancement pursuant to section 654. Custody credits of 485 days for time served prior to his plea and conduct credits of 72 days were awarded for total custody credits of 557 days. Victim restitution of $21,249.21 was ordered along with a restitution fine. Other fees, fines and assessments were also ordered.

Appellant obtained a certificate of probable cause. Appellate counsel has filed a brief seeking independent review of the case by this court pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).

## FACTS

### *Gang Membership, Activity, and Predicate Offenses*

The following evidence was presented to the grand jury. The prosecution's gang expert testified that Sureño gangs in Bakersfield are hostile to each other. Among these rival gangs are the Loma Bakers who claim the east side of Bakersfield as their territory and the West Side Bakers who claim west Bakersfield as their territory.

A shooting by a rival gang is a sign of disrespect in gang culture. Gang members thrive off of respect, fear, and intimidation. A shooting by a gang member of a rival gang member would compel retaliation. Retaliation against a rival gang for a shooting does not have to be against the perpetrator. One would gain status in a gang by retaliating and shooting someone from a rival gang. Assisting another gang member in committing a murder, for instance, would earn that person respect within the gang.

4

For gang members, asking someone where they are from is considered a challenge. Asking where one is from can lead to a gang member indentifying his or her gang and "throwing a sign" for that gang. This can be considered disrespectful. When a confrontation occurs in front of fellow gang members, there is an expectation they will all join in an attack of a rival gang member. When a group of gang members goes out together, it is common for them to carry firearms. This is especially true when such a group goes into another gang's territory. When a fellow gang member travels with a gun, everyone in the group knows. It is disrespectful not to tell others in the group when one is carrying a weapon.

On October 29, 2010, Christopher Moreno, a member of the Loma Bakers, admitted committing a burglary and his gang membership, and was convicted of burglary and the gang enhancement for the commission of that offense. On January 29, 2010, Ariel Rosete of the Loma Bakers, while an active member of the gang, committed an assault with a deadly weapon for the benefit of the gang. Rosete was flashing a gang sign during the offense and claimed Loma Baker membership while he was being booked.

Codefendants Emmanuel Toscano, Hilario Aguero, Gabriel Gonzales, and Fernando Garcia-Santos have all admitted membership in the Loma Baker gang. Emmanuel Toscano's brother, Jacob Toscano, was a member of the Hillside gang, a subset of the Loma Bakers. Appellant has a "KC" tattoo and a three-dot triangle representing the Sureño gang, the gang with which the Loma Bakers are affiliated.

In April 2011, Jacob Toscano was shot in Loma Baker territory by a shooter who yelled "South Side." Jacob yelled back "Hillside" or "East Side." Emmanuel Toscano was also shot by a rival gang member while in Loma Baker territory.

*Murder of Gerardo Villapudua*

A Quinceanera party was announced for Saturday evening, April 30, 2011, at Santiago's Restaurant on South H Street close to downtown Bakersfield. Santiago's is

5

considered to be in west Bakersfield gang territory. Melina M. was living near Jefferson Park in the territory of Loma Bakers. Melina had been invited to the Quinceanera. The day prior to the party, Melina was introduced to Emmanuel Toscano by one of her sisters at a park. Melina invited Toscano to the Quinceanera party. At first Toscano was hesitant to go to the party until he learned it was at Santiago's.

Toscano texted and later called Melina. Toscano told her to meet him outside the restaurant in an alley. Melina met Toscano, who had arrived with five others. Melina recognized two of the men, Aguero and Garcia-Santos, from Jefferson Park. After talking to Melina and learning there was no free beer at the party, Toscano walked to Harry's Liquor, next door to Santiago's, to purchase beer for his friends. Toscano left Harry's with a 3-pack of beer. Melina talked to Toscano. Toscano's brother and Gonzales were also present.

Eduardo P. and Eduardo G. and their friend Anthony V. arrived to the party around 7:00 p.m. or 8:00 p.m. and walked over to Harry's. As the defendants walked into Harry's, Eduardo G. heard them yell "West Side Bakers." Eduardo P. heard all of them yell "West Side" and "East Side Killer." Eduardo P., Eduardo G., and Anthony V. returned to Santiago's and sat at an enclosed patio area for 20 minutes.

After a few minutes, Francis R. and Gerardo Villapudua arrived in a Volkswagen driven by Francis. They parked in the church parking lot directly next to Santiago's. Francis R. knew Villapudua was a tagger, but did not consider him to be a West Side Baker or a member of any other gang. Eduardo P. and Eduardo G. walked over to the car and socialized for a few minutes before everyone returned to the patio to eat.

Someone in Toscano's group yelled "West Side" from the parking lot next door and threw gang signs. Eduardo G. asked Francis R. to drive him home to pick up a sweater. As Eduardo P., Eduardo G., Francis R., and Villapudua were headed toward the Volkswagen, they were being followed by the defendants. Toscano confronted them,

6

asking, "Where are you from?" They replied to Toscano's group that they did not "bang." Villapudua, however, remained quiet. People in Toscano's group said they were from the West Side or they were West Side Bakers. Toscano and other members of his group kept pressing the group in Francis R.'s Volkswagen where they were from, and the response was that they did not bang.

Someone in the Toscano group asked where the East Siders were. Eduardo P. replied he did not know. Villapudua told Toscano he had gotten into a fight with East Siders. Toscano said, good because he did not like them. Toscano shook everyone's hand and said, "Well, just keep it West Side."

Then Villapudua said he was from the Southwest. The defendants' attitude changed. They became more aggressive and wanted to fight Villapudua. Gonzales told Villapudua that Villapudua would have to catch a "fade," meaning he wanted to fight Villapudua. Villapudua kept saying no to the invitation to fight.

Eduardo G., Eduardo P., Villapudua, and Francis R. got into the Volkswagen. Gonzales reached into the car and took Villapudua's cell phone. Villapudua demanded that Gonzales return his phone but Gonzales said he could get it back if they fought. Gonzales pretended to give Villapudua's phone back, but grabbed his hat. Neither the hat nor the phone were returned.

As Gonzales's confrontation with Villapudua was happening, the other defendants were standing a few feet away watching. Villapudua told Gonzales that he was going to call the older "homies." The defendants looked angry and became loud. The defendants yelled things like "West Side." The defendants also called Villapudua a "bitch."

As Francis R. was trying to pull the car out of the parking space, Toscano opened the passenger door, pointed a gun at Villapudua, and fired at him. Villapudua ran out of the car toward Santiago's but fell down not far from the car. One bullet went through the speedometer of Francis R.'s Volkswagen and cut wiring in that vicinity.

7

Toscano's fingerprints were recovered from a can of beer. Appellant's fingerprints were also identified on a beer can found at the scene. Melina heard appellant yell "West Side" when the defendants were at Harry's. Appellant was standing with Toscano during the confrontation. Appellant was 16 years old at the time of the offense.

## APPELLATE COURT REVIEW

Appellant's appointed appellate counsel has filed an opening brief that summarizes the pertinent facts, raises no issues, and requests this court to review the record independently. (*Wende*, *supra*, 25 Cal.3d 436.) The opening brief also includes the declaration of appellate counsel indicating that appellant was advised he could file his own brief with this court. By letter on February 4, 2013, we invited appellant to submit additional briefing. To date, he has not done so.

After independent review of the record, we have concluded there are no reasonably arguable legal or factual issues.

## DISPOSITION

The judgment is affirmed.