Filed 3/16/22  P. v. Jordan CA2/8
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RALPH M. JORDAN,<br><br>    Defendant and Appellant. | B295816<br><br>(Los Angeles County<br>Super. Ct. No. SA092100) |

APPEAL from the judgment of the Superior Court of Los Angeles County.  Lauren Weis Birnstein, Judge.  Affirmed.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Zee Rodriguez, Idan Ivri and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

Ralph Jordan (appellant) and three other men were charged with attempted robbery of a bank in violation of Penal Code sections 211, 664[1] and attempted murder during the failed robbery in violation of sections 664, 187, subdivision (a). One codefendant, Jeffery Brown, entered into a plea agreement and testified at trial against appellant and remaining codefendants Bryan Speight and Harold Johnson. Speight and Johnson had unsuccessfully sought plea agreements before trial; later, at the end of the People's case-in-chief, they were able to reach plea agreements, but did not enter their pleas until after the trial. Jordan's case was submitted to the jury, which convicted him as charged, and found true the allegation that a principal was armed with a handgun in the commission of both offenses. (§ 12022, subd. (a)(1).)

Jordan waived his right to jury trial on prior conviction allegations. The court found true allegations that appellant had served three prior prison terms (§ 667.5, subd. (b)) and suffered three prior serious felony convictions (§ 667, subd. (a)) which were also strike convictions (§§ 667, subds. (b)-(j), 1170.12.). The trial court struck the three section 667.5 enhancements. It also struck the firearm enhancement and the three prior serious felony enhancements for the attempted murder conviction count. The court sentenced appellant to a total term of 50 years to life in state prison, plus a determinate term of 16 years.[2]

---

[1] Undesignated statutory references are to the Penal Code.

[2] The sentence was 1) 25 years to life pursuant to the "Three Strikes" law, plus three 5-year terms for three prior serious felony conviction enhancements plus a one-year term for the

On appeal from the judgment of conviction, Jordan contends: 1) Speight and Johnson effectively entered into plea agreements before trial and the court violated his state and federal constitutional right to a fair trial by allowing the two men to sit with him as codefendants at trial; 2) his attempted murder conviction must be dismissed pursuant to Senate Bill No. 1437; 3) the trial court abused its discretion in admitting evidence he participated in a prior uncharged robbery; 4) the trial court erred in preventing appellant's counsel from clarifying that one of his prior robbery convictions did not involve a bank; 5) the trial court erred in permitting appellant's spouse, Toi Wright, to testify about privileged marital communications; and 6) there was cumulative prejudice.

Appellant also claims four sentencing errors: 7) insufficient evidence supports the court's finding that his 1990 robbery conviction qualified as a strike; 8) the court erroneously refused to consider a collateral attack on his 2001 attempted robbery conviction; 9) Senate Bill No. 136 requires a remand for resentencing even though the trial court struck all the section 667.5 enhancements when it sentenced appellant; and 10) the trial court violated his state and federal constitutional rights when it imposed fines and fees without conducting an ability-to-pay hearing.

On February 4, 2021, we affirmed the judgment of conviction. On April 21, 2021, the California Supreme Court granted appellant's petition for review and deferred further

firearm enhancement for the attempted robbery conviction, all consecutive to one another; and 2) a consecutive 25 years to life term pursuant to the Three Strikes law for the attempted murder conviction.

3

consideration of the matter pending disposition of a related issue in another case. On February 16, 2022, the Supreme Court transferred the matter back to us with directions to vacate our prior decision and reconsider the cause in light of Senate Bill No. 775 (Stats. 2021, ch. 551). We now vacate our previous decision. We remand the matter to the trial court to set an evidentiary hearing on appellant's section 1170.95 petition as to his attempted murder conviction. In all other respects, the judgment is affirmed.

## BACKGROUND

When unarmed security guard Frederic James opened the doors of OneWest Bank in Culver City about 9:00 a.m. on January 21, 2016, there was a line of customers awaiting entry. Among those waiting were codefendants Brown, Speight and Johnson. Brown was wearing blue latex gloves and sunglasses. Their plan was to rob the bank only if the guard was inside the bank during the robbery. When Brown reached the door, James told him to take off his sunglasses. Brown looked back in Speight's direction and shook his head to indicate "No." Speight nevertheless moved toward the bank entrance, followed by Johnson. James noticed Speight, who appeared to be looking at Brown. Speight was wearing sunglasses and blue latex gloves as well. James was suspicious of Speight and when Speight reached toward his waistband, James pushed Speight in the chest. As Speight fell to the ground, he pulled a handgun from his waistband and fired three shots at the now fleeing James.

Brown, Speight and Johnson then ran to a nearby Impala, which was backed into a parking space with the engine running. A person, later determined to be appellant, was in the driver's seat. Surveillance video showed the three men running to and

4

entering the Impala. As the Impala drove away, a bystander in the parking lot saw the license plate number and provided it later to responding police. Police soon found the Impala, which had been abandoned less than a mile from the bank.

Brown was captured as he fled on foot from the area where the Impala was abandoned. Speight was arrested in a nearby TJ Maxx store. Appellant and Johnson were arrested the next day.

On the day he was arrested, Brown provided information about the attempted robbery. He subsequently entered into a plea agreement and testified at trial as a prosecution witness. After appellant was arrested, his wife Toi Wright provided police with information about appellant's activity on the day of the attempted robbery.

Brown had known appellant for many years, and called him "uncle." According to Brown, about a month before the robbery attempt, appellant introduced him to Speight and Johnson. About a week later, appellant began planning the bank robbery.

Appellant's plan called for Brown to enter the bank first and to be responsible for keeping the doors open. Speight would follow Brown into the bank and tell everyone to get down on the ground. Johnson would then enter the bank, jump over the counter and get the cash. Johnson would then hand the cash to Brown, who would run to his own Ford Explorer parked nearby and submerge the cash in an ice chest filled with water to destroy any dye pack in the money. Brown would drive the Explorer to appellant's residence. Appellant, Speight and Johnson would follow in another car. A fifth man, John-John, would drive a third "trailing car," and possibly act as a look-out with a sixth man, Sideways.

5

On January 20, 2016, Brown went with appellant and John-John to "case" OneWest Bank. They also wanted to make sure the security guard was unarmed.

About 6:30 a.m. on January 21, Brown went to appellant's residence. Speight and John-John were already there. Johnson and Sideways arrived later. At 7:30 a.m. appellant's wife Wright returned home from her night shift at work. She had been expecting to go to a second job but it was cancelled. She saw appellant, Brown, Speight, Johnson and John-John sitting down eating breakfast. She asked appellant why they were there, but appellant told her to stay out of his business. He had an attitude. Wright left at 8:00 a.m. in her Impala to take her son to school.

According to Brown, appellant prepared the men for the robbery. He gave Brown and Speight hats and sunglasses, and gave Brown a red shirt and Speight a tan shirt. He applied makeup to cover up their tattoos and facial features. Appellant gave Brown a computer bag containing a handgun and a small bag to keep the bank door open. Appellant also gave Speight a handgun. He gave Johnson a dark hoodie and a mask. Appellant told all the men to leave their personal items, including their cell phones and wallets, at his house.

When Wright returned home, the men were getting ready to leave, and Wright asked appellant where he was going. He did not tell her; he said only that he would be back. Appellant asked to borrow her Impala, and she gave him the keys. The men left around 8:30 a.m. in several cars.

According to Brown, appellant, Speight and Johnson left in the Impala. Brown drove his Explorer to the bank and parked it in back. Appellant picked up Brown and the men all drove to the front of the bank.

6

The men began to implement the robbery plan. When the security guard outside the bank told Brown to take off his sunglasses, Brown shook his head "No" to indicate to Speight that they should abandon the robbery, which was contingent on the security guard being inside the bank. But Speight continued to move forward. After Speight shot at the security guard, Brown, Speight and Johnson all abandoned the robbery and ran to the Impala. Appellant drove them away from the scene. Appellant and Brown both criticized Speight for firing the gun. Speight replied he had panicked.

Appellant pulled the Impala over after driving a short distance, saying police would be looking for the car. The four men got out and began to walk in different directions. Before he left the car, Brown removed the red shirt he had been wearing.

Brown soon heard police sirens and panicked. He called appellant on a secondary cell phone he had brought with him to the robbery. Appellant told Brown to meet him at a nearby TJ Maxx store. When the call ended, Brown noticed a police car. An officer got out of the car, and Brown fled. As he ran, he attempted to delete information from the cell phone before discarding it. Brown was apprehended by police and his cell phone was recovered. Security guard James and another bank employee separately identified Brown in field show-ups. Police also discovered Brown's Explorer in the bank parking lot. Inside, they found a white Styrofoam cooler filled with water and a pair of latex gloves.

Wright testified appellant called her about 9:15 a.m. and told her to drive to Culver City and go by the bank on Jefferson. When Wright asked him why, he told her to stop asking questions. To her, he sounded frantic and nervous. Wright drove

to the location and saw police cars and yellow tape at the bank. She called appellant's cell phone, but he did not answer. She drove home.

Wright testified appellant returned home about 10:00 a.m. driving his Camry. When Wright asked him what was going on, he told her to stay out of his business and to be quiet and let him think. He then told Wright to report the Impala stolen. Wright watched the morning news with appellant, and they saw a report of the attempted robbery of OneWest Bank.

Appellant next told Wright to drive him to Culver City in the Camry. He directed her to the bank, where Wright saw police officers and television crews. Wright noticed Brown's Explorer in the parking lot. Appellant told her to drive to a nearby TJ Maxx. There, they saw Speight handcuffed next to a police car. Appellant said, " 'Fuck, they got him.' "[3] As they drove back past OneWest Bank, Wright saw her Impala with police around it. When she asked appellant why the car was there, he told her to be quiet and drive.

Shortly after Wright and appellant returned home around noontime, Johnson arrived with three other people: Sideways, John-John, and John-John's girlfriend. Everyone then went with appellant to his mother's house. Around 2:30 p.m., they all returned to appellant's and Wright's residence. Appellant and Wright drove the Camry to pick up Wright's son from school.

After that, appellant again asked Wright to drive him to Culver City. When they drove past the bank and saw that

---

[3]    Police had arrested Speight inside the TJ Maxx about 10:00 a.m. Police searched the store and found two pairs of latex gloves in the restroom area. At field show-ups, Speight was identified as one of the robbers.

Brown's Explorer was no longer in the parking lot, appellant began cursing. They returned home.

That night, Wright went to work. The next morning, as she was returning home, a police officer called and told her appellant had been arrested. When she arrived home, she falsely told police officers appellant was with her at the time of the attempted bank robbery. She later truthfully told police he was not with her.[4] Police searched their residence and found Brown's wallet, primary cell phone, and clothing.

The previous day police had searched the Impala and found numerous documents with appellant's and Wright's names in the car. On the front seat, police found a ski mask with blue latex gloves inside. The mask contained a mixture of DNA, some of which was contributed by Johnson. Police also found a red shirt, a hat and a pair of sunglasses. They found a Louis Vuitton satchel, which Wright later identified as appellant's. The satchel held a nine-millimeter handgun. Several blue latex gloves were found in the vicinity. In a nearby yard, police found a light brown shirt with Speight's DNA. A man in the neighborhood found a handgun and gave it to police. Testing later showed the handgun was the firearm which had been discharged outside the bank.

Brown's initial statement to police proved to be incomplete or inaccurate. He omitted John-John's involvement completely.

---

[4] Wright made several false statements when she initially spoke to police because one of the officers mentioned the possibility that her child would be taken away. For example, she falsely told police she did not know Johnson and she did not mention John-John's presence. She was not honest about her activities on January 21.

Later, Brown agreed to share a jail cell with appellant. Appellant told Brown: " 'You gotta get me out of this and put Yellow Boy [John-John] in it.' " Appellant used a street term which suggested Brown would not be around much longer if he failed to help appellant. Brown then asked to speak to Detective Bingham, and told him the driver of the Impala had been John-John, not appellant. He said appellant had driven a Camry to the vicinity of the bank (or more precisely to the Culver City steps).

Brown subsequently made a proffer to give a truthful statement about the robbery. In this statement, Brown explained appellant planned the robbery and drove the Impala.

To prove appellant's intent the People offered evidence that appellant was the getaway driver in an uncharged bank robbery in Orange County in 2004. In that robbery, a man entered the bank, demanded money and received cash with a dye pack inside. He was driven away from the bank by appellant. When police activated their lights and siren, appellant accelerated to a speed over 120 miles per hour. During the ensuing pursuit, money was thrown out of appellant's car, some of it stained with red dye. The car eventually stopped and appellant and the other man were arrested.

The People also offered the testimony of Culver City Police Department Detective Thompson about the three defendants' cell phone usage. Detective Thompson examined their cell phones and billing records. About 48 hours before the bank robbery, Johnson texted appellant: "B at yo spot around 8 in the A.M. when I drop him off. Everything is a go. Rte. They ready now. No? How they going to approac." Appellant replied: "Yeah, br0. Can you be a little earlier?" Johnson sent a reply stating: "What

10

time the spot open at?  9:00, right?  Shit.  We don't want to be sitting around.  What time you want me to be there and what time is W?"  Johnson then added:  "Open at 7:20.  Ima be there as soon as it open."  Jordan replied:  "Like 7:30."

Cell phone tower information showed phones belonging to appellant, Brown, Sideways, and John-John were all in the vicinity of OneWest Bank about 9:00 a.m. the day before the attempted robbery.[5]  The information showed the phones moved from the vicinity of appellant's residence to the bank and then back to appellant's residence.

The night before the attempted robbery, there was an exchange of texts between appellant's and Johnson's phones.  Johnson's phone texted:  "How's everything looking?  Is the youngin ready?  You got to let him know exactly what to do.  Can't slip, Dog.  Real talk."  The detective explained that "can't slip" meant "can't get caught."  Jordan's phone replied:  "Yup.  They rt here br0."  Johnson's phone texted back:  "Okay.  Put him up on what he got to do and make sure they got them button-down shits (sic).  You know the look."

On the morning of the attempted robbery, appellant's phone texted Johnson:  "Everything A1."  Call records showed appellant's phone also called Brown's and John-John's cell phones the morning of the robbery.  Appellant's phone called Brown nine times between 6:30 a.m. and 9:12 a.m. and Brown's phone called appellant three times less than six minutes after the bank robbery attempt.

---

[5]     More precisely, the information showed the movement of a cell phone with a number matching the number listed in appellant's cell phone directory for Sideways.

Cell phone tower information showed Johnson's phone was moved to appellant's residence the morning of the robbery and remained there. Phones belonging to appellant, Brown, Sideways, and John-John were also moved from appellant's residence to the bank about 9:00 a.m. Less than 30 minutes after the attempted bank robbery, Wright's phone was moved from her residence to the bank.

After the People rested their case, Jordan began to testify on this own behalf. During the lunch break, the People made plea offers to Speight and Johnson, which they accepted. The People also offered appellant a plea agreement of 25 years to life, which he rejected. Appellant continued to testify for the remainder of the day. No proceedings occurred the next day, a Friday. On Monday morning, outside the presence of the jury, Speight and Johnson formally entered their no contest pleas. When the jury arrived, the court instructed it: "The charges against defendants Speight and Johnson no longer need to be decided by you in this case. Do not speculate about or consider in any way why the charges against defendants Speight and Johnson do not need to be decided. Thank you." The court then added: "I just want to make it very clear to you that from this point on, you can't discuss why defendants Speight and Johnson are no longer here in this case, or [why] you need not decide any of the charges against them. You don't discuss it at all going forward. That includes your deliberations. You are not to address that issue whatsoever. [¶] All the evidence, though, that you've heard is still to be considered by you in any way you believe is appropriate, okay? All right." Appellant called a witness out of order, then resumed testifying on his own behalf.

Appellant denied being involved in the attempted bank robbery. Appellant acknowledged knowing Brown and Johnson for a long time and stated he met Speight and John-John through Brown in 2015.

While in prison, he met and married Wright. In June 2015, he moved in with her and her son when he was released from prison. Appellant had health problems and could not walk when he got out of prison. In December 2015, he discovered Wright was pregnant with another man's child and decided to leave her.

On January 20, 2016, the day before the robbery, appellant spoke with Brown about an insurance scam involving a Camry. About 8:00 a.m., John-John and another man arrived at appellant's residence with the Camry. Appellant learned Brown, Johnson, and John-John were planning to use the Camry to commit a robbery with two people named Youngin and Mario. Appellant talked Youngin and Mario out of participating in the robbery and took possession of the Camry.

Appellant did not have his cell phone between 7:30 a.m. and 10:00 a.m. on January 20. He had given it to Wright, who was unhappy appellant had been using the phone to talk to other women. He suggested Wright had used the phone to communicate with Brown, John-John, and Sideways.

Appellant testified John-John arrived at his residence on January 21 between 4:30 a.m. and 5:00 a.m. Brown and Speight arrived later. At some point, appellant fell asleep. When he awoke the men and the Camry were gone. Appellant called Brown and John-John and they returned the Camry. Speight was with them. Wright and Johnson separately arrived at the residence after 7:30 a.m.

At 7:45 a.m., appellant took Wright's son to school in the Camry. When he returned about 8:30 a.m., the men were gone, as was the Impala. Wright thought the men might have taken it. Appellant called Brown and Sideways. Sideways said he was in the car; Brown denied taking the car. Appellant drove the Camry to the bank to look for the Impala. As he got closer, he heard sirens and so he drove around Culver City looking for the Impala. He did not find it.

At 9:12 a.m., Brown called appellant and asked for a ride. Appellant refused and returned home about 10:00 a.m. Wright was not there, so he called her. She came home soon thereafter, driving Johnson's car. Sideways was with her. John-John and his girlfriend arrived soon thereafter.

At 10:30 a.m., appellant saw a television news report that Speight had been arrested at a TJ Maxx. Appellant began to suspect Wright had been involved in the robbery. They drove to Culver City in the Camry to find the Impala. They found it, but did not stop because a police officer was standing next to it. Later that day, Johnson gave Wright the keys to the Impala, and Wright and appellant again drove to Culver City to look for the car. This time, the car was surrounded by police officers. Appellant wanted to tell police what had happened but Wright was afraid.

Appellant explained that the text messages he exchanged with Johnson on January 19 related to a planned trip to a barber shop. Appellant claimed he did not understand Johnson's text messages on January 20 about Youngin and slipping but had simply agreed to them. He also claimed the references to button-down shirts related to a previous Orange County bank robbery

14

involving Johnson and whether he looked cool or hot. Appellant testified the January 21 text to Johnson involved the Camry.

## DISCUSSION

I.  The Trial Court Did Not Err in Ruling That Speight and Johnson Could Remain as Codefendants and No Unfairness Subsequently Arose from Their Presence at Counsel Table.

Appellant contends the trial court violated his state and federal constitutional due process right to a fair trial by allowing his codefendants Speight and Johnson to remain as defendants in appellant's trial after they "effectively" entered into plea agreements with the People. He claims he should have been tried alone.

A.  *Background*

During voir dire, the People offered all three defendants the same plea: a determinate term of 22 years in prison in exchange for their guilty pleas. Speight and Johnson wished to accept the deal; appellant did not. The People's alternate offer to Speight and Johnson was 22 years in exchange for what the trial court described as "a factual basis for your plea where you'd have to spill the beans on everything, and you'd have to make a statement on the record, and then you could be available for them to call you as a witness in the case. And you also would not be sentenced until the trial was over."

Speight and Johnson declined to give a factual basis plea. The court then stated that the People's alternate offer was "the same offer of 22 years . . . but you can't get it until the end of the People's case. You have to sit through the trial, okay, until they're finished with their evidence." The prosecutor clarified that the offer was that "the plea would not come after the

15

People's case.  It would come after the case is complete, after the defense case, and it goes to the jury."  She explained the reasoning behind this timing:  "unless it was a factual-basis plea, I'm not going to be willing to risk that they'll go and testify on behalf of [appellant]."

Appellant objected to his codefendants sitting through the trial and argued that it would create a conflict.  The prosecutor responded:  "You know, I didn't expect this from [appellant's] counsel. . . .  My only alternative would be to withdraw all offers and go forward on all three of them.  And if [appellant] and his counsel are happy with that, then I think that's what we have to do."

After appellant continued to object to letting Speight and Johnson sit through trial with the option of a plea agreement at the end, the court replied:  "So, you know, this is causing an issue that I did not foresee because it has been done on many occasions.  Just because you haven't seen it, counsel, doesn't mean it is not possible.  I talked to a judge downtown that does long-cause trials.  He's a very experienced judge.  You even suggested that I talk to him about it, and he indicated that everything is fine doing it this way."

The court ended the discussion by confirming its understanding that the deal was off the table, and asked the People to consider at the end of trial that Speight and Johnson wanted to take the offer.  The prosecutor agreed that the deal was off the table and that she would "consider it after trial and think about what the court has said."

B.      *No Backdoor or "Effective" Plea Agreement Was Reached Before Trial*

Appellant relies on general due process principles to support his contentions, noting:  "Neither the term 'due process' nor the concept of fundamental unfairness itself, is susceptible of precise and categorical definition. . . .  Every allegation of due process denied depends on the specific process provided." (*Brecht v. Abrahamson* (1993) 507 U.S. 619, 639-640 (conc. opn. of Stevens, J.).)  Appellant also points out that both the United States Supreme Court and California Supreme Court "have long emphasized the importance of preserving the integrity of the trial process.  (See, e.g., *Carey v. Musladin* (2006) 549 U.S. 70, 80; *Neal v. McAninch* (1995) 513 U.S. 432, 442; *In re Boyette* (2013) 56 Cal.4th 866, 890.)"

Appellant contends the decision to let Speight and Johnson sit as defendants at trial was structural error which requires reversal per se.  (See *Arizona v. Fulminante* (1991) 499 U.S. 279, 309 ["structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards" require reversal per se].)  This is the entirety of appellant's legal authority and argument.  He has not cited, nor are we aware of, any authority holding that a violation of due process occurs under the circumstances presented here.

As respondent points out, appellant is essentially arguing his trial should have been severed from the trial of his codefendants.  The general rule is that " ' " '[a]ntagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other.' " ' " (*People v. Gomez* (2018) 6 Cal.5th 243, 274-275.)

17

The failure to sever one defendant from another does not constitute structural error and will not ordinarily require reversal on appeal unless it actually results in "gross unfairness" to one of the defendants. (*People v. Montes* (2014) 58 Cal.4th 809, 834; see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 41 [reversal for erroneous denial of motion to sever required only if there is a reasonable probability of a more favorable outcome if motion had been granted].)

We do not agree Speight and Johnson "effectively" entered into plea agreements before trial.

Speight and Johnson were free to change their minds during trial and testify on behalf of appellant. If unexpected problems arose with the People's case, they could try to capitalize on those problems and let the case against them go to the jury. Similarly, if the People decided the case against appellant was not unfolding strongly enough, Speight and Johnson could have been informed there would be no plea deal without a factual basis from them (which they had been unwilling to provide). If a witness unexpectedly provided evidence showing Speight or Johnson was more culpable than the People believed (for example, they had discussed killing the security guard as part of the robbery), the People were free to let the case go to the jury knowing there was a very strong case for a true finding on the allegation that the attempted murder was willful, deliberate and premeditated.

Thus, there was no binding agreement when trial began, and the trial court did not err in denying appellant's request that Speight and Johnson not be seated as codefendants.

C. *Appellant Has Not Shown That Events After The Court's Ruling Prejudiced Him or Rendered His Trial Unfair.*

We acknowledge, as set out above, that a defendant may suffer prejudice if subsequent events render the trial grossly unfair, justifying reversal of the judgment of conviction. That, however, was not the case here.

Appellant claims he was prejudiced because: 1) he was forced to share the total number of peremptory challenges with the codefendants; 2) the People failed to take the case against Speight and Johnson seriously during the case-in-chief; and 3) Speight and Johnson disappeared from the courtroom at the end of the prosecution's case. None have merit.

1. *Appellant Has Not Shown He Was Prejudiced by the Allocation of Peremptory Challenges.*

Appellant contends he was prejudiced because he had only five individual peremptory challenges and had to share 20 joint peremptory challenges with Speight and Johnson. If tried alone, appellant would have received 20 individual challenges. He asked the trial court to give him 20 individual challenges. The court denied the request, explaining: "If you find that you are not agreeing on the peremptories, you can make a motion to ask for more peremptories. Let's see how it plays. I don't believe that 20 joint peremptories – I think that everybody would be exercising them in the same manner. But if you are disagreeing with the attorneys, the other attorneys, you can say so, and we can go sidebar, that you disagree with what the other attorneys are doing."

19

Appellant did not use all his peremptories and did not request additional peremptories from the trial court. He has not identified any disagreement with Speight or Johnson over the use of the joint peremptory challenges. Appellant has failed to show any prejudice in this area.

2. *Appellant Has Not Shown Prejudice from Counsel's Conduct of the Trial or Codefendants' Conduct During Trial.*

During the course of the plea discussion, the court stated its belief that Speight's and Johnson's counsel "are going to act differently during the trial than they would if they were going to full-on attack the People's evidence." After appellant objected, the court stated: "At any time, if the defendants change [their] mind, because they have not entered a plea, they can present evidence. . . . If they change their mind, they can do whatever they want to, and the People may or may not offer the same deal. So nobody's tying anybody's hands in this trial."

Appellant then argued that proceeding under such an understanding would mean that Speight's and Johnson's counsel "can't defend their clients under the 6th Amendment." Counsel for Speight replied: "Whatever the court's comments are, I don't think are binding in any way. We can do what we need to do to properly represent our clients, and that's what we're doing now. Whatever happens during the trial is a decision for myself and my client." Counsel for Johnson then stated: "And that expresses our position, as well."

When appellant then characterized the situation as a conflict, the court asked counsel for Speight and Johnson: "If I were to say to you, I want you to try the case the way you would no matter what, are you prepared and ready to do that?" Counsel

for Speight replied: "I don't know that there would be anything differently done." He elaborated: "The DNA is very strong on my client. There's video of my client. My client is caught at the scene. There is a substantial amount of evidence against my client. I'm going to ask questions at the trial. . . . I don't think I'm going to act adversely to [appellant]." He added that he intended to ask questions of the security guard because he was "the alleged victim in this case. So I don't know that I would act any differently if we were going forward in a normal -- without any deal in place." Counsel for Johnson stated that there were two primary issues that concerned Johnson: cell tower evidence and DNA evidence. He explained: "I've spoken to experts, and it certainly would be revealed if we went over – I've already told [the prosecutor] this. If I went forward, the advice from both of them was not to go forward, and that they may help me in terms of cross-examination, but my understanding in speaking to both, neither could help me in terms of guilt or innocence. They were of the opinion that their testimony would not be beneficial. [¶] That said, I would cross-examine -- if I had to go to trial on this, there are issues, but those are issues I could deal with and could bring forward."

Counsel's comments reflected the reality of Speight and Johnson's situation: the evidence against them was extremely strong. Much of the action at the bank was captured on surveillance video. The DNA and cell phone location evidence linking them to the robbery was not particularly vulnerable to challenge. They had few options for a defense.

In spite of this difficult situation, codefendants and their counsel participated in the trial. Appellant does not identify any trial tactics which would have caused the jury to think the men

were engaging in a sham. Johnson's counsel gave an opening statement. While Speight's counsel did not, the trial court instructed the jury that "[t]he defense is not required to present an opening statement, but if it chooses to do so, it may give it either after the People's opening statement or at the beginning of the defense case." The two main prosecution witnesses were Brown and Wright; their testimony was most damaging to appellant, who thoroughly cross-examined them. Appellant has not identified any lines of inquiry with those witnesses which Speight or Johnson could have been expected to pursue but did not. Speight extensively cross-examined the security guard, and Johnson questioned him as well. Counsel for both men cross-examined bank employee Figueroa. Speight also questioned one of the detectives. The cell phone records and tower location information were damaging to Johnson, but even more damaging to appellant. Appellant's counsel conducted a multi-day cross-examination of Detective Thompson which focused on these topics. Appellant does not identify any lines of inquiry on these topics which Johnson could have been expected to pursue but did not. Appellant does not explain what else Speight and Johnson could have done through cross-examination during the People's case-in-chief. The codefendants' participation in the trial process was reasonable given the evidentiary realities.

Appellant also contends the People did not vigorously litigate the case because the People did not introduce evidence in their possession that Johnson had suffered a prior conviction for bank robbery. Appellant claims this decision left the jury with the impression that he was the only experienced bank robber, which reinforced Brown's testimony that appellant was the

22

mastermind. Appellant would have been in the same position if he had been tried alone.

Appellant also contends the men engaged in misconduct by falling asleep and "cackling" during trial. He made this claim in connection with his motion for a new trial. The trial court stated it had not heard any cackling or out-loud laughter. The court stated Speight's eyes had closed during trial, but it was during a portion of the trial which did not relate to him and so was understandable.[6]

3. *There Is No Basis to Infer The Jury Was Influenced by Speight's and Johnson's Departure from The Trial.*

Appellant contends codefendants' lackadaisical behavior during trial "signaled" to the jury that they accepted the strength of the People's case. He claims that codefendants' "sudden departure" in "mid-trial likely confirmed that perception." This

---

[6] The court's full statement was: "Now, with regard to the cackling, I heard no cackling. There was never any obvious, loud laughing on the part of any of the defendants. Yes, there were times I did see Mr. Speight's eyes close. There were moments that were not all that exciting during the course of the trial where I would understand why another defendant might not be paying attention when evidence did not relate to him. And, yes, his eyes might have closed. There were times where there were humorous things that might have happened during the trial. And yes, people are human, and they smile. There was never a cackling, out-loud laughing during any of the proceedings that I remember or believe I ever saw." Appellant also suggested one of the other attorneys did numerous crossword puzzles during trial. The trial court stated it never saw anyone doing a crossword puzzle.

23

in turn would make the jury more inclined to accept the People's case and disbelieve Jordan.

As we have explained, the codefendants presented a reasonable defense and did nothing to suggest to a jury that they accepted the People's evidence. The jury was instructed not to speculate about the reason it was no longer being asked to decide the charges against Speight and Johnson. We presume the jury followed that instruction and did not engage in the sort of speculation in which appellant now engages. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 152 [presuming jury followed instruction to separately consider the evidence against each defendant].)

II.     Senate Bill No. 1437, As Amended, Applies to Convictions of Attempted Murder under The Natural And Probable Consequences Doctrine And Appellant Is Entitled to An Order to Show Cause And Evidentiary Hearing on His Section 1170.95 Petition.

Appellant contends, and the People agree, his conviction of attempted murder must be reversed because it is based on the natural and probable consequences doctrine, which was eliminated as a basis for liability under Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), as amended by Senate Bill No. 775 (Stats. 2021, ch. 551).

Generally, a defendant seeking resentencing under Senate Bill 1437 must file a petition for relief in the trial court pursuant to section 1170.95. (*People v. Gentile* (2020) 10 Cal.5th 830, 853, 858.) Section 1179.95 establishes a procedure for introduction of evidence and factfinding usually necessary before relief can be granted; it does not provide for direct appellate relief. (*Gentile, supra,* 10 Cal.5th at pp. 853, 858.) Here, the People do not

24

appear to dispute appellant was convicted under the natural and probable consequences doctrine, and thus it appears appellant's claim involves a pure question of law.

After the trial court ruled in this matter, the Legislature amended Senate Bill 1437 to extend relief under section 1170.95 to those defendants convicted of attempted murder under the natural and probable consequences doctrine. We agree with the parties that appellant was convicted of attempted murder under this theory of liability. Therefore, he is entitled to the issuance of an order to show cause and to an evidentiary hearing under section 1170.95, subdivision (d). The matter is remanded as to the attempted murder conviction for these further proceedings.

III. Evidence of Appellant's Prior Uncharged Bank Robbery Was Properly Admitted to Show Intent.

Appellant contends the trial court abused its discretion in admitting evidence that he was the getaway driver in a prior uncharged bank robbery attempt. The trial court admitted the evidence pursuant to Evidence Code section 1101, subdivision (b), for the limited purpose of showing intent. Appellant contends that the issue in this case was identity, and there was no disputed issue as to the intent of the getaway driver. He further contends that the admitted evidence was so prejudicial it violated his state and federal constitutional rights to due process by rendering his trial fundamentally unfair.

A defendant who enters a not guilty plea puts every element of the charged offense at issue, including intent. (*People v. Carpenter* (1997) 15 Cal.4th 312, 379.) Thus, the evidence was relevant.

The People were clearly concerned that Speight or Johnson would provide testimony favorable to appellant; the People structured the plea offer to prevent that occurrence. As we have discussed above, no plea agreement was reached before trial. Thus, it remained possible during the People's case-in-chief that Speight and Johnson would offer testimony exonerating appellant, including perhaps testimony that appellant was the driver but was unaware of their plans. Similarly, nothing prevented appellant from testifying in his own defense that he agreed to drive his friends to the bank and/or drive them home without knowing what their plans were. Perhaps this testimony would not have been effective, but the People did not have to gamble on what precise defense appellant would ultimately offer.

Further, less hypothetically, Brown's pretrial statements at one point placed appellant driving the Camry, which Brown had at other times described as the "trail car" for the robbery.[7] As it turned out, when appellant testified, he acknowledged driving the Camry the morning of the murder and driving in the vicinity of the bank near the time of the robbery. He then provided an innocent explanation for being in the area, claiming he was looking for the Impala, which appellant claimed was being used by Brown and Sideways. In light of Brown's statement, appellant's intent in driving the Camry in the vicinity of the bank was very much an issue.

_____

[7] Brown testified at trial that the plan called for appellant to drive the Impala and John-John to drive the Camry as a "trail car." When Brown named John-John as the driver of the Impala before trial to placate appellant, he put appellant into the Camry. Brown was not clear about appellant's role in this capacity, but he did indicate at trial that appellant drove the car in the vicinity of the bank and/or the Culver City steps.

Evidence of an uncharged offense offered to show intent is still subject to exclusion under Evidence Code section 352 if the probative value of the evidence is outweighed by the potential that the evidence will be unduly prejudicial. (*People v. Leon* (2015) 61 Cal.4th 569, 597–598.) A trial court's decision to admit such evidence is reviewed for an abuse of discretion.

" ' "Prejudice," as used in Evidence Code section 352, is not synonymous with "damaging." [Citation.] Rather, it refers to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual, and has little to do with the legal issues raised in the trial.' " (*People v. Masters* (2016) 62 Cal.4th 1019, 1062.) Here the prior bank robbery did not involve the use of a weapon, and so was not inflammatory compared to the facts of this case. (See *People v. Molano* (2019) 7 Cal.5th 620, 666 [comparing severity of offense admitted pursuant to Evid. Code, § 1101 with current offense].) The trial court did not abuse its discretion in admitting evidence of the prior uncharged robbery. Neither were there state or federal constitutional violations.

IV.    There Was No Basis to Admit Details of Appellant's Prior Robbery Conviction.

Appellant contends the trial court erroneously prevented him from presenting evidence that his 2000 robbery conviction did not involve a bank.

Appellant cites no authority permitting the admission of such facts. His theory is that admission of the evidence was necessary to prevent the jury from speculating that the 2000 robbery involved a bank. Appellant has cited no authority permitting the introduction of evidence for such a purpose. Initially, appellant simply states broadly that all relevant evidence is admissible. (Evid. Code, § 350; Cal. Const., art I, § 28,

27

subd. (f)(2).)  While this is true, it is also true that *only* relevant evidence is admissible.  (Evid. Code, § 351)  Appellant has not explained how the evidence is relevant.

" 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)

The prosecutor offered the conviction for impeachment purposes, and it is well settled that past misconduct, particularly if it involves moral turpitude, may have a tendency to prove a witness is not truthful.  (*People v. Wheeler* (1992) 4 Cal.4th 284, 295–298.)  Appellant does not explain how evidence that a person committed a non-bank robbery rather than a bank robbery would have a tendency to show that the person is credible.  The choice of victim has no apparent bearing on the veracity of the robber.

Indeed, appellant does not make such an argument in his opening brief.  Rather, he argues that the details were necessary because, absent the details, the jury might "speculate that [the robbery might] have also been a bank robbery."  He also argues the details would "prevent an inference that [appellant had] an extended history of bank robberies."

As appellant acknowledges, the jury had already been presented with evidence that he had participated in a prior attempted robbery of a bank, and had been instructed that it could consider that evidence only in deciding appellant's intent as to the current charge.  Given this use of the attempted robbery incident, we see no way that the jury would have speculated in the manner argued by appellant.  The jury's logical response to the robbery conviction would be to infer it did not involve a bank

28

because it was not included in the instruction about the uncharged bank robbery evidence and intent. Assuming for the sake of argument there was a slight possibility jurors might speculate about the nature of the robbery conviction, the appropriate method of preventing speculation in this case would have been a jury instruction.

And here the jury was instructed: "You must decide what the facts are in this case. You must use only the evidence that is presented in the courtroom. 'Evidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I tell you to consider as evidence." This instruction is sufficient to convey to a jury that it should not speculate. (See *People v. Dykes* (2009) 46 Cal.4th 731, 795–796.)

The jury was also given complementary instructions on the use of appellant's prior robberies which showed the different purposes for which the prior uncharged bank robbery and the prior robbery conviction were admitted. It was instructed specifically and in detail about the use of the prior uncharged bank robbery to prove intent. The jury was also instructed about the permitted use of prior felony convictions: "If you find that a witness, including the defendant, has been convicted of a felony, you may consider that fact in evaluating the credibility of the witness's testimony. The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable." Finally, the jury was instructed: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

Given the instructions as a whole, there is no reasonable probability or possibility appellant would have received a more favorable outcome if he had been permitted to clarify that the robbery conviction was not for robbing a bank.

V.     Appellant Was Not Prejudiced by The Erroneous Admission of Two of Wright's Statements Which Were Covered by The Marital Privilege.

Appellant contends four sets of statements he made to Wright on the morning of the robbery were covered by the marital privilege and the trial court erred in admitting the statements.  He further contends the erroneous admission rendered the trial fundamentally unfair in violation of his state and federal due process rights.  The People contend appellant has forfeited this claim.

The record does not appear to reflect the full activity by the trial court or the parties on this issue.  We have augmented the record with the following settled statement, certified by the trial court:  "A discussion was held regarding defense counsel's objection to Toi Wright's testimony on marital privilege grounds. The court discussed its likely tentative ruling in favor of admissibility. The parties were unable to reach a stipulation as to what extent, if any, the discussion was held on the record."

The People maintain a pretrial tentative ruling is insufficient to preserve an issue and appellant was required to press for a final ruling.  (See, e.g., *People v. Holloway* (2004) 33 Cal.4th 96, 133.)  They also argue appellant was required to make a specific and timely objection in the trial court to particular identifiable statements.  (See, e.g., *People v. Crittenden* (1994) 9 Cal.4th 83, 127.)  Given the uncertain state of the record,

as reflected in the very brief settled statement, we will exercise our discretion and decline to treat the claim as forfeited.

Evidence Code section 980 provides "one spouse may prevent another spouse from disclosing a communication that 'was made in confidence between him and the other spouse while they were husband and wife.' " (*People v. Cleveland* (2004) 32 Cal.4th 704, 743.) " '[T]he privilege applies only to oral or written verbal expression from one spouse to the other, and acts of the spouses committed in each other's presence do not constitute *communications* between them, within the meaning of the privilege for confidential marital communications.' " (*Ibid.*) " 'To make a communication "in confidence," one must intend nondisclosure. . . .' [Citation.] 'While a communication between a husband and wife is presumed to be confidential, if the facts show that the communication was not intended to be kept in confidence, the communication is not privileged.' " (*Id.* at p. 744.)

As appellant acknowledges, erroneously admitted evidence is normally reviewed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818, which requires reversal of a conviction only if it is reasonably probable appellant would have received a more favorable outcome in the absence of the error. Appellant contends admission of Wright's testimony deprived him of state and federal constitutionally required due process by rendering the trial fundamentally unfair and so must be reviewed for prejudice under the standard in *Chapman v. California* (1967) 386 U.S. 18. Appellant offers almost no explanation for how exactly this testimony rendered the trial fundamentally unfair. We examine each of the statements.

A.    *First Statement*

Appellant contends the marital privilege applied to Wright's testimony about appellant's plans on the morning of the robbery.  Wright testified that when she asked appellant where he was going, he replied "I'll be back." She asked him where he was going this early and he again replied, "I'll be back."

The People suggest appellant made these remarks in the presence of the other men, which would render the privilege inapplicable.  (*People v. Bradford* (1969) 70 Cal.2d 333, 342, fn. 2 [privilege does not apply to statements defendant made to his spouse in the presence of three other people].)  The People are correct Wright testified that upon her return from taking her son to school, "I go in the house and they're, like, I guess, getting ready to leave or whatever, so I'm asking [appellant] 'Where are you going?' "  Before making this statement, however, Wright expressly testified the other men were outside when she came home from taking her son to school.  There is no indication the men followed her into the house.  Thus, Wright's testimony as a whole does not support a finding that others were present when she spoke with appellant.

The facts indicate appellant did not intend his response to Wright to be confidential, however.  Earlier, when Wright got home from work, she saw the men "sitting down eating breakfast or eating something, and me and [appellant] got into an altercation.  I walked in the house, and I asked him, 'Why are they here?'  [¶]  And he's all, like, 'Just stay out of my business,' like, with an attitude, basically."  His later refusal to answer her question about where he was going with the men was essentially just a different way of telling her to stay out of his business.  (See *People v. Gomez* (1982) 134 Cal.App.3d 874, 879 [defendant's

statements to wife were not intended to be confidential when he repeated those statements in the presence of other people].) Alternatively, assuming the earlier response was not similar enough to waive the privilege, that response was substantively the same as appellant's refusal to tell Wright where he was going, and so any error in the admission of the "I'll be back" answers was harmless under either *Watson* or *Chapman*.

B.     *Second Statement*

Appellant contends his telephonic request to Wright that she drive to the bank to meet him was covered by the marital privilege.  Wright testified appellant called her about 9:15 a.m. and asked her to come to Culver City, specifically to " 'come down here on Jefferson over by the bank.' " She "kept asking why.  He wouldn't give me an answer.  He was like, 'Just stop asking me' – excuse my language—'fuckin' questions and come to Culver City.' "  Wright went to the bank but could not find appellant.

The People contend the marital privilege did not apply to the second statement because "the communication was made, in whole or in part, to enable or aid anyone to commit or plan to commit a crime or a fraud."  (Evid. Code, § 981.)  The People claim appellant was asking Wright to be an accessory to the bank robbery.  Appellant contends there is no evidence Wright was aware of the bank robbery and so would have lacked the intent necessary to be an accessory to a crime.

Nothing in the language of Evidence Code section 981 requires that the spouse actually agree to the request for aid in committing a crime in order for the exception to apply.  Neither party addresses the issue presented here:  whether the spouse must be aware at the time of the communication that she was being asked to help the requesting spouse commit a crime.  The

33

cases cited by the People all involve instances where it was reasonable to infer the spouse was aware she was being asked to engage in criminal activity, but do not discuss whether such awareness is a prerequisite to the application of the exception. Appellant cites only cases discussing the requirements for being an accessory.

Assuming for the sake of argument that the substance of the phone conversation was covered by the marital privilege, the admission of Wright's testimony would be harmless under either the *Watson* or *Chapman* standard of review. Wright's testimony that she received a phone call from appellant about 9:15 a.m. was admissible. (*People v. Bradford*, *supra*, 70 Cal.2d at p. 342, fn. 2 [marital privilege does not bar testimony that witness received a phone call from her spouse at a particular time].) Wright's action of driving to the bank in response to the phone call was not a communication by appellant and so the marital privilege did not apply. She could testify concerning the actions she took in response to the phone call. (See *Tanzola v. De Rita* (1955) 45 Cal.2d 1, 8 [citing with approval an out-of-state case holding that the marital privilege did not bar the wife from testifying to the fact that she had a conversation with her husband or to the action which she took as a result of the conversation].) Thus, the admission of the substance of appellant's communication on the phone, that is, that he asked her to come to the bank, added very little, if anything, to Wright's observations and actions.

C. *Third Statement*

Appellant contends his remark upon seeing Speight in handcuffs at the TJ Maxx was covered by the marital privilege. Wright testified that when she and appellant drove by the TJ Maxx and saw Speight in handcuffs, appellant stated, "Fuck,

they got him." Without citation to authority, the People contend this was a spontaneous statement by appellant and so not covered by the marital privilege. We understand the People to mean that since spontaneous statements are by their nature made without an opportunity for reflection, appellant could not have intended the statement to be confidential. (See Cal. Law Revision Com. com., Deering's Ann. Evid. Code, § 1240 (2020) [discussing "the spontaneity of such statements and the consequent lack of opportunity for reflection"].)

Marital communications are presumed to be confidential. (*People v. Cleveland, supra,* 32 Cal.4th at p. 744.) However, " 'if the facts show that the communication was not intended to be kept in confidence, the communication is not privileged.' " (*Ibid*.) As we have discussed, the law is clear that a spouse's decision to communicate publicly with his or her spouse or to repeat private spousal statements in public can be reasonably understood as a decision by the speaking spouse to forgo confidentiality. The same cannot be said of a spontaneous statement. If the spouse has no time to reflect before speaking, the spouse cannot be understood as deciding to forgo confidentiality. The presumption stands.

There is no reasonable probability (or possibility) that appellant would have received a more favorable outcome if the statement had been excluded. At most appellant's exclamation shows that he was aware of the plan to rob the bank. A failure to act to prevent a crime does not give rise to criminal liability. Further, appellant's own testimony reflected this awareness. He testified he learned on January 20 that Brown, Johnson, John-John, and two other men were planning to commit a bank robbery using the Camry. Appellant convinced the two other

35

men not to participate and he took possession of the Camry. Appellant also testified Speight, Brown, and John-John were at his residence the morning of January 21 and left in the Impala while appellant was using the Camry to drive Wright's son to school. Appellant also testified he later drove the Camry to OneWest Bank looking for the Impala. Thus, appellant's own testimony indicated he believed the men, including Speight, were involved in the robbery mentioned the previous day.

D. *Fourth Statement*

Appellant contends his statements when he saw police surrounding Wright's Impala were covered by the marital privilege. Wright testified that when appellant saw the police, he said to Wright: "Let me think. Just be quiet. Just drive." Respondent contends this statement fell within the crime exception to the marital privilege. We agree.

By the time appellant made this statement, Wright was much more aware of the morning's events than when she received appellant's first phone call which caused her to drive to the bank and see the police activity going on there. Since that first phone call, appellant had returned home, and then had asked Wright to drive him to Culver City. There he directed her to the bank, where she observed that police were still present. She also saw the Explorer parked near the bank. Wright and appellant then drove past a handcuffed Speight near the TJ Maxx. Finally, they came to Wright's Impala, which was surrounded by police. It was at this point appellant made the challenged statement. It is reasonable to understand appellant's direction to Wright to keep driving as asking for help to avoid detection by the police and that Wright would have understood this as such a request given all she had just observed. Thus, assuming the crime exception

36

requires the spouse to know that she is being asked to assist in criminal activity, that requirement would be met here. The crime exception to the marital privilege applied. (Evid. Code, § 981.)

VI.    There Is No Cumulative Prejudice.

Appellant contends that even if the individual errors in his trial were not prejudicial individually, when viewed cumulatively, those errors were prejudicial and violated his state and federal constitutional rights to due process and a fair trial. We have found only one error, the admission of some marital communications to Wright by appellant, and have found that minor error harmless. We have found no prejudice to appellant from being tried with Speight and Johnson; no error in the use of appellant's prior uncharged offense to prove intent or the use of his prior robbery conviction as impeachment; no error in the refusal to let appellant clarify that his attempted robbery conviction did not involve a bank. There is no error to cumulate. (See *People v. Hines* (1997) 15 Cal.4th 997, 1075 [even considered cumulatively, the few errors which occurred were inconsequential].)

We now turn to appellant's claims of sentencing error.

VII.   The 1990 Robbery Conviction Is A Strike.

The prosecutor alleged appellant suffered a strike conviction in 1990 for robbery. Appellant was 16 years old at the time, but gave the false name of Kelvin/Kevin Grant and a date of birth that would have made him 19 years old at the time of the robbery. The abstract of judgment shows appellant was represented by counsel when he entered a guilty or no contest plea to the robbery charge.

Appellant objected to the use of the 1990 conviction, contending it was invalid because the law at the time did not permit direct filing of charges against 16-year-old's in adult court. In such circumstances, the case should have been filed in juvenile court and moved to adult court only after a fitness hearing determined the juvenile was unfit for juvenile court. There was no evidence of a fitness hearing.

In his opening brief, appellant acknowledged that collateral attacks are permitted on prior convictions alleged as sentencing enhancements only if the defendant was denied the right to counsel or was denied his *Boykin-Tahl* rights. (*Custis v. United States* (1994) 511 U.S. 485, 487; *People v. Allen* (1999) 21 Cal.4th 424, 442; *Boykin v. Alabama* (1969) 395 U.S. 238; *In re Tahl* (1969) 1 Cal.3d 122 (*Tahl*).) He contends these limitations are based in part on the ease of determining such violations and so we should consider his claim because it is easy to determine that he did not receive a fitness hearing. He claims that absent evidence of a fitness hearing there is insufficient evidence to support the trial court's finding that the 1990 conviction was a valid prior conviction; he further contends due process requires proof beyond a reasonable doubt of every element of a crime.

The cases cited by appellant all require the violation of a fundamental constitutional right. We reject appellant's suggestion that the law should be expanded to permit collateral challenges whenever it would be easy to prove an error occurred in the prior case.

We agree with the People that the requirement of a fitness hearing is a state procedural rule and the failure to hold a fitness hearing does not violate a juvenile's fundamental constitutional rights (see *Manduley v. Superior Court* (2002) 27 Cal.4th 537,

546–547); trying a juvenile in adult court without a fitness hearing is an act in excess of the court's jurisdiction but the lack of a hearing does not deprive the court of subject matter jurisdiction (*In re Harris* (1993) 5 Cal.4th 813, 838–840, overruled on another ground by *Shalabi v. City of Fontana* (2021) 11 Cal.5th 843); and a defendant may not complain on appeal about a state procedural defect which he invited or to which he consented.  (See *People v. Saunders* (1993) 5 Cal.4th 580, 589-590.)

In his reply brief, appellant acknowledges this claim may be forfeited if not timely asserted.  He contends, however, that the trial court had an affirmative duty under Welfare and Institutions Code section 604, subdivision (a), to determine whether he was an adult.  He asks us to hold that in light of this duty, no objection from the minor is required, and a failure by the court to discover that a defendant is a minor renders any adult conviction invalid.  We decline this invitation.

Welfare and Institutions Code section 604, subdivision (a) imposes a duty to investigate "[w]henever . . . it is suggested or appears to the judge before whom the person is brought that the person charged was, at the date the offense is alleged to have been committed, under the age of 18 years."  We agree with our colleagues in Division 6 that section 604 is not implicated where the defendant conceals his or her age and so "there is never any suggestion or indication during the course of the proceedings that the defendant is subject to the jurisdiction of the juvenile court." (*People v. Level* (2002) 97 Cal.App.4th 1208, 1211–1212 (*Level*) ["Appellant was never adjudged a ward of the court with regard to the prior conviction at issue here, nor was any fitness hearing ever held, because she never revealed her true age in the course

39

of the prior action."])  Here, the case against a duty to investigate is even stronger, since appellant provided not only a false date of birth, but a false name as well.

In *Level,* appellant conceded that an individual can waive the right to have his or her action proceed in the trial court. Appellant did not agree that she could waive her right to a juvenile disposition.  (*Level*, *supra*, 97 Cal.App.4th at p. 1211.)  As the *Level* court pointed out, it is well established that both the right to an adjudication and to a juvenile disposition can be forfeited if they are not asserted in the trial court.  (*Id.* at pp. 1212–1213.)

The reason for this rule is clear:  "Had [appellant] disclosed her true age while the trial court in the prior action still had jurisdiction over the matter, the prosecution could have petitioned the court to find her unfit for juvenile adjudication [citation] and, if appropriate, challenged her claim that she was only 17 when she committed the charged offense.  [Citation.]  The prosecution also could have sought to set aside the plea bargain agreement on the ground that appellant had misrepresented her age.  [Citation.]  By her silence, appellant deprived the prosecution of these opportunities."  (*Level*, *supra*, 97 Cal.App.4th at p. 1213.)

Further if, as seems likely, appellant here pled guilty as part of a plea agreement, the plea bargain would be an additional reason for applying forfeiture and estoppel:  " 'A defendant may not retain the favorable aspects of his negotiated disposition and at the same time jettison its unfavorable aspects.  [Citation.]' [Citation.]  Appellant agreed to be sentenced as an adult on the robbery count in exchange for the dismissal of two other counts, and she has long since completed her prison sentence.  Having

enjoyed the fruits of her negotiated disposition, she cannot now be heard to complain that the court exceeded its jurisdiction in convicting and sentencing her as an adult. 'A litigant who has stipulated to a procedure in excess of jurisdiction may be estopped to question it when "To hold otherwise would permit the parties to trifle with the courts." ' " (*Level, supra*, 97 Cal.App.4th at p. 1213.)

VIII. The Trial Court Correctly Ruled That A Collateral Attack on the 2001 Conviction Was Not Permissible.

Appellant contends the trial court erred in failing to consider a collateral attack on his 2001 attempted robbery conviction. Defense counsel initially objected to the use of this conviction on the ground that it was alleged in the information as a July 2001 conviction for robbery, but appellant withdrew his plea to that offense, and pled guilty to attempted robbery and was resentenced in September 2001. When asked to explain what prejudice appellant would suffer if the prosecutor were permitted to amend the information to allege the correct date and offense, counsel replied: "I will state the prejudice. I am going to state under information and belief that the motion to withdraw the plea was granted because [appellant] was not advised it was a strike, and when he came back and pled to the attempt 211, he was advised that he would [not be] sentenced as a strike offender."

Appellant acknowledges California law sharply limits the circumstances in which a prior conviction may be collaterally challenged, but claims that his argument in the trial court amounted to a claim that the prior conviction could not qualify as a strike on account of a *Tahl* violation and so a challenge was permissible. He claims that *Tahl* requires that before entering a

41

guilty plea, a defendant must be advised as to " 'the nature of the charge and the consequences of his plea.' ([*Tahl*, *supra*, 1 Cal.3d] at p. 132.)"

We agree California law permits a collateral challenge for *Tahl* violations, but do not agree appellant has described such a violation. Appellant's claim in the trial court was fundamentally that the use of the attempted robbery conviction as a strike would violate the terms of his plea agreement. That does not implicate *Tahl*. Defense counsel was unable to locate the record of the plea agreement in the case, but did state that he had a copy of the *Tahl* waiver. Even assuming for the sake of argument that appellant has now shifted his theory on appeal to claim that the *Tahl* waiver does not show an advisement of the "consequence" that the conviction could be used as a strike in the future, he still would not have identified a *Tahl* violation.

As the California Supreme Court has explained: "When a criminal defendant chooses to plead guilty (or, as here, no contest), both the United States Supreme Court and this court have required that the defendant be advised on the record that, by pleading, the defendant forfeits the constitutional rights to a jury trial, to confront and cross-examine the People's witnesses, and to be free from compelled self-incrimination. (*Boykin v. Alabama*[, *supra*,] 395 U.S. 238 [89 S.Ct. 1709, 23 L.Ed.2d 274]; [*Tahl*, *supra*,] 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449].) In addition, this court has required, as a judicially declared rule of state criminal procedure, that a pleading defendant also be advised of the direct consequences of his plea. [Citations.] If the consequence is only collateral, no advisement is required." (*People v. Gurule* (2002) 28 Cal.4th 557, 633–634.) It is well settled that "the 'possible future use of a current conviction is not

a direct consequence of the conviction.' " (*Id*. at p. 634.) Accordingly, the future use of a conviction as a strike is not a direct consequence requiring advisement. (*People v Sipe* (1995) 36 Cal.App.4th 468, 479.)

IX.    Senate Bill No. 136 Does Not Entitle Appellant to A Remand for Resentencing.

In sentencing appellant, the trial court exercised its discretion and struck the three section 667.5, subdivision (b), prior prison term enhancements. While this case was pending on appeal, Senate Bill No. 136 (2019-2020 Reg. Sess.) (Senate Bill 136) was signed into law. That bill restricts application of section 667.5 to prison terms served as a result of a conviction for a sexually violent felony. None of appellant's prior convictions were for such an offense. Appellant acknowledges there are no section 667.5 enhancements to his sentence, but contends that the matter must nevertheless be remanded to permit the trial to exercise its informed sentencing discretion and reconsider the sentence it previously imposed.

If appellant's sentence contained section 667.5, subdivision (b) enhancement terms and we struck them pursuant to Senate Bill 136, then it might be necessary to remand this matter to the trial court to reconsider the entire sentencing scheme. (See *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1259.) This is "because an aggregate prison term is not a series of separate independent terms, but one term made up of interdependent components" and the "invalidity of one component infects the entire scheme." (*People v. Hill* (1986) 185 Cal.App.3d 831, 834.) Appellant's sentence is entirely valid, however, and there is no requirement for us to remand this matter.

43

Appellant points out that the bar to using the section 667.5 enhancements creates a lower maximum possible sentence and speculates that the trial court might have imposed a lower total sentence if the court had known of this lower ceiling.

The trial court found appellant did not fall outside the spirit of the Three Strikes law, and there is no possibility the enactment of Senate Bill 136 would change the trial court's conclusion on this issue. The trial court explained that in deciding the 16-year determine term, it found a number of aggravating factors and no mitigating factors. There is no possibility that Senate Bill 136 would change this balance. There is no possibility the trial court would impose a more favorable sentence on remand and thus no need for remand.

X. Appellant Has Forfeited His Claim That The Fines and Fees in This Case Were Improperly Imposed.

Appellant contends the trial court's imposition of a $30 court facilities assessment (Gov. Code, § 70373), a $40 court operations assessment (§ 1465.8), and a $300 restitution fine (§ 1202.4) without a finding that he had the ability to pay those amounts was a violation of his constitutional rights as set forth in *People v. Dueñas* (2019) 30 Cal.App.5th 1157.[8] Appellant did not object to the imposition of the fines and assessments, but contends no objection was required because he was sentenced

---

[8] The California Supreme Court has granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, on the issue of whether a trial court must "consider a defendant's ability to pay before imposing or executing fines, fess, and assessments" and if so, "which party bears the burden of proof regarding the defendant's inability to pay."

before *Dueñas*, which represents a change in the law. We agree with *People v. Frandsen* (2019) 33 Cal.App.5th 1126, which finds that *Dueñas* did not represent such a dramatic failure in the law to obviate a forfeiture. (*Id.* at pp. 1153–1155; see also *People v. Avila* (2009) 46 Cal.4th 680, 729 [finding forfeiture where the defendant failed to object to imposition of restitution fine under former § 1202.4 based on inability to pay].)

Appellant also contends imposition of the assessments and fine constitutes cruel and unusual punishment. This claim is forfeited as well by appellant's failure to raise it in the trial court.

Appellant contends that if these claims are forfeited, he received ineffective assistance of counsel. "To prevail on this claim, petitioner must prove ' "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant." ' [Citation.] ' "A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' [Citation]. If a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient." (*In re Crew* (2011) 52 Cal.4th 126, 150.)

Here, appellant has not shown prejudice: he has not shown that if his counsel had objected, the People would have been unable to prove his financial ability to pay the $370 in assessments and a fine.[9]

---

[9]   We assume for the sake of argument that the People have such a burden.

The People could simply have pointed to appellant's trial testimony to show that appellant had sufficient financial assets to enable appellant to pay the $370 in assessments and a fine. When appellant testified at trial about vehicles he had owned, his attorney asserted to the court that the testimony was relevant to show that appellant "was flush. He had no money worries . . . he had no need for money or to be part of a robbery when he had all these assets." Appellant further testified he had $27,000 in cash at his home. Appellant points out he testified at trial that Wright took this money, but he acknowledges that the court found this testimony speculative and inadmissible. In any event, it does not change our analysis.

## DISPOSITION

The denial of the resentencing petition is reversed and that matter is remanded for the issuance of an order to show cause and evidentiary hearing pursuant to section 1170.95, subdivision (d). In all other respects, the judgment of conviction is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, J.

We concur:


GRIMES, Acting P. J.


WILEY, J.

46